STATE OF NORTH CAROLINA v. RANDY JOE PAYNE

No. 254A88

(Filed 3 April 1991)

1. Jury § 6.3 (NCI3d) — voir dire — detailed questioning restricted — no error

The trial court did not err during jury selection in a first degree murder prosecution by allowing defense counsel to question in detail only those individual jurors who responded positively to questions of the whole panel and who seemed to favor the death penalty. The trial court's conduct of the jury selection process was well within its discretionary authority and did not violate N.C.G.S. § 15A-1214(c).

Am Jur 2d, Jury §§ 200, 202.

2. Constitutional Law § 344 (NCI4th) — jury selection — absence of defendant — no prejudicial error

There was no prejudicial error in a first degree murder prosecution where the trial court began the second day of jury selection before defendant was present in court. It was error for the trial court to question jurors in defendant's absence,

but defendant's absence during the preliminary questioning of prospective jurors did not result in the rejection of any juror whom defendant was entitled to have on the panel or the seating of any juror whom defendant was entitled to reject either for cause or peremptorily.

**Am Jur 2d, Jury § 190.**

**Validity of jury selection as affected by accused's absence from conducting of procedures for selection and impaneling of final jury panel for specific case. 33 ALR4th 429.**

3. **Jury § 6 (NCI3d) — voir dire — statements of prosecutor — aggravating. circumstances not ultimately relied upon**

There was no prejudicial error during jury selection for a first degree murder from the prosecutor's reference to certain aggravating circumstances upon which the State ultimately did not .rely. A new sentencing proceeding was ordered on other grounds and, as to the guilt phase, there was no further mention of other crimes; the evidence of defendant's guilt of murder and rape was strong; and the entire focus of the trial related solely to those crimes. Although a prosecutor during jury voir dire should limit references to aggravating factors, including the underlying felonies listed in N.C.G.S. § 15A-2000(e)(5), to those of which there will be evidence and upon which the prosecutor intends to rely, here there was no reasonable possibility that a different result would have obtained had not the prosecutor mentioned the other crimes.

**Am Jur 2d, Jury §§ 204, 207.**

4. **Criminal Law § 412 (NCI4th) — voir dire — prosecutor's forecast — aggravating factor rejected by judge**

There was no prosecutorial misconduct in a first degree murder prosecution from the prosecutor's forecast to the jury during voir dire that it might consider evidence of an especially heinous, atrocious or cruel killing as an aggravating factor when the judge decided at sentencing not to submit that factor. Even if the evidence was not sufficient to sustain submission of the especially heinous aggravating factor, the case was not so lacking in evidentiary support for that factor that it was impermissible for the prosecutor to forecast reliance on it at the outset of the trial.

**Am Jur 2d, Jury §§ 204, 207.**

5. **Criminal Law § 361 (NCI4th)— members of victim's family — seated behind prosecution within bar — no abuse of discretion**

There was no abuse of discretion in a first degree murder prosecution where the court allowed the prosecutor to seat members of the victim's family behind the prosecution table and within the bar of the courtroom where the prosecutor made no mention of the victim's family and did not identify family members sitting inside the bar. Where particular persons who are witnesses or who have an interest in the trial sit in the courtroom is a matter left to the trial court's discretion.

**Am Jur 2d, Criminal Law § 878; Trial § 296.**

6. **Criminal Law § 506 (NCI4th)— first degree murder — unsworn deputy transporting jury — no prejudicial error**

There was no prejudicial error in a first degree murder prosecution from an unsworn deputy transporting the jury where the properly sworn bailiff was disabled; another deputy was assigned to the task and transported the jurors without being sworn; the court questioned the deputy for the record upon discovering what had happened; the deputy stated that he knew nothing about the case other than defendant's name when he transported the jury and that he had not discussed the facts or circumstances or proceedings of the case with any jury member; and the court then swore in the deputy. Defendant does not contend that his case was affected by the unsworn deputy and prejudice will not be presumed, as in *State v. Mettrick*, 305 N.C. 383, because the appearance of impropriety which prompted the *Mettrick* decision did not exist here. N.C.G.S. § 15A-1236.

**Am Jur 2d, Trial §§ 943, 944.**

7. **Searches and Seizures § 36 (NCI3d)— clothing — seized after arrest — no error**

The trial court did not err in a first degree murder prosecution by denying defendant's motion to suppress clothing seized from him several hours after his arrest where the police had already taken lawful custody by arresting defendant.

**Am Jur 2d, Searches and Seizures §§ 37, 93.**

**Modern status of rule as to validity of nonconsensual search and seizure made without warrant after lawful arrest as af-**

fected by lapse of time between, or difference in places of, arrest and search. 19 ALR3d 727.

8. **Searches and Seizures § 36 (NCI3d)— murder—alleged unnecessary delay in first appearance—seizure of clothing—no error**

The clothing of a first degree murder defendant was not taken as evidence as a result of an unnecessary delay in defendant's appearance before a magistrate in violation of N.C.G.S. § 15A-501(2) where defendant was arrested between 10:30 and 11:00 a.m. and taken to a detective's office; taken before a magistrate about noon, charged with murder, and returned to the detective's office; and defendant's clothing was taken sometime between 1:00 and 3:00 p.m. There was no showing of any unnecessary delay between defendant's arrest and appearance before the magistrate, and, even if there was, no showing that the clothes were taken as a result.

**Am Jur 2d, Searches and Seizures §§ 37, 93.**

**Modern status of rule as to validity of nonconsensual search and seizure made without warrant after lawful arrest as affected by lapse of time between, or difference in places of, arrest and search. 19 ALR3d 727.**

9. **Criminal Law § 84 (NCI3d)— hair samples—nontestimonial identification order—no unreasonable intrusion on privacy**

The taking of head and pubic hair samples pursuant to a nontestimonial identification order was not an unreasonable intrusion on defendant's privacy. N.C.G.S. § 15A-271.

**Am Jur 2d, Expert and Opinion Evidence §§ 278, 301; Searches and Seizures § 105.**

10. **Criminal Law § 50 (NCI3d)— murder—opinion testimony of serologist—admissible**

There was no error in a first degree murder prosecution from the admission of an SBI serologist's testimony that approximately one percent of North Carolinians have the same blood characteristics as the victim where the witness testified that his opinion was based on statistics from SBI studies conducted between 1979 and 1983 and from scientific journals, both of which he testified are generally relied on by other experts in his field. The agent's testimony laid a sufficient

foundation to support the admission of his expert opinion, and his estimate of the number of blood analyses he had performed in his career was relevant to the issue of his experience.

**Am Jur 2d, Expert and Opinion Evidence §§ 60, 62, 63; Homicide § 397.**

11. **Criminal Law § 42.1 (NCI3d)— murder—carpet fibers— admissible**

The trial court did not err in a first degree murder prosecution by admitting testimony comparing carpet fibers from defendant's residence taken more than a month after his arrest with fibers found on his clothing the day of his arrest where the officer who took samples from defendant's home testified that he did not know if the carpet had been in defendant's home at the time of the murder. It is common knowledge that homeowners do not change or replace carpets as frequently as once every several months and, nothing else appearing, a jury could reasonably infer that a carpet was in a home several months before and after the time it was actually found there. That there was no direct evidence that the carpet was in defendant's home at the time of defendant's arrest goes to the weight of the evidence rather than its admissibility.

**Am Jur 2d, Evidence §§ 774, 776.**

12. **Criminal Law § 50.1 (NCI3d)— murder—hair analysis—expert opinion**

The trial court did not err in a first degree murder prosecution by allowing the State to introduce certain testimony by an SBI expert in hair analysis where the SBI agent's testimony that a hair found on the victim's clothing had some characteristics, albeit limited, inconsistent with the victim's hair tends to make the sexual assault upon the victim more probable and his testimony that the hair had some characteristics, albeit limited, consistent with defendant's hair tends to make defendant's contact with the victim more probable.

**Am Jur 2d, Expert and Opinion Evidence §§ 278, 301; Homicide § 397.**

13. **Criminal Law § 88.2 (NCI3d) — murder — cross-examination of defendant's mother — inflammatory questions concerning inadmissible evidence**

There was insufficient evidence to require a new trial in a murder prosecution where the prosecutor's questions and statements concerning locks on defendant's door and whether defendant's mother feared him were clearly improper, but the trial court sustained defendant's objections, defendant's mother testified that she was not afraid of her son, and the properly admitted evidence against defendant was strong. Defendant did not meet his burden of showing a reasonable possibility that there would have been a different result without the prosecutor's improper cross-examination. N.C.G.S. § 8C-1, Rule 404(a).

Am Jur 2d, Trial § 194; Witnesses §§ 471-476.

14. **Homicide § 21.5 (NCI3d) — first degree murder — evidence sufficient to submit to jury**

The evidence of first degree murder was sufficient to submit to the jury where it was clear that the circumstantial evidence was sufficient to enable a rational jury to find that defendant was the perpetrator of the crimes for which he was convicted, and evidence that defendant cites as anomalous to his guilt simply raised a conflict for the jury to resolve.

Am Jur 2d, Homicide §§ 425, 426.

15. **Criminal Law § 462 (NCI4th) — murder — prosecutor's argument on matters not in evidence — no objection — no error**

The trial court in a first degree murder prosecution was not required to intervene *ex mero motu* where the prosecutor argued that a hair from defendant's head was found under the victim's fingernail and the pathologist testified that the hair was retrieved either from under the victim's fingernail or from the back of the victim's hand. The prosecutor's statement did not so grossly contradict the evidence as to require the trial court to recognize the discrepancy and intervene *ex mero motu*.

Am Jur 2d, Trial §§ 234, 259.

16. **Criminal Law § 436 (NCI4th)— murder—prosecutor's argument—conviction needed to prevent defendant from committing more crimes—objection sustained—no error**

Although it was improper for the prosecution in a first degree murder prosecution to urge the jury to convict defendant in order to prevent him from committing more crimes, the court properly sustained defendant's objection and instructed the jurors not to consider the argument, and it must be assumed the jury followed the instruction.

**Am Jur 2d, Trial §§ 226, 315.**

17. **Criminal Law § 1352 (NCI4th)— murder—sentencing—McKoy error—sentence vacated and remanded**

A death sentence was vacated and remanded under *State v. McKoy*, 327 N.C. 31, where it could not be said beyond a reasonable doubt that, absent the unanimity instruction, no juror could have found the existence of the impaired capacity mitigating factor, weighed it in the final balancing process in deciding between life imprisonment and death, and concluded that life imprisonment should have been imposed.

**Am Jur 2d, Criminal Law § 609; Homicide § 553.**

APPEAL by defendant pursuant to N.C.G.S. § 7A-27, from a judgment imposing a sentence of death entered by *Long, J.*, at the 10 February 1988 Criminal Session of Superior Court, DAVIDSON County. Defendant also gave notice of appeal from his conviction and sentence of life imprisonment for rape but failed to move to bypass the Court of Appeals; this Court, *sua sponte*, allowed the bypass. Heard in the Supreme Court 13 December 1989.

*Lacy H. Thornburg, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Benjamin G. Philpott and Franklin A. Bell for defendant-appellant.*

EXUM, Chief Justice.

This appeal is from the second trial of this case. We ordered a new trial on defendant's first appeal in *State v. Payne*, 320 N.C. 138, 357 S.E.2d 612 (1987).

STATE v. PAYNE

[328 N.C. 377 (1991)]

Defendant was tried and convicted on proper bills of indictment charging him with first degree murder (No. 83CRS16387) and first degree rape (No. 83CRS16747). We find no error in the guilt phase of defendant's trial. The decision in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, *on remand*, 327 N.C. 31, 394 S.E.2d 426 (1990), requires that we remand for a new sentencing hearing.

I.

The State's evidence at trial tended to show the following:

Between 10:15 and 10:30 a.m. on 9 November 1983, Frances Leonard, while working at the Davidson Animal Hospital in Lexington, N.C., looked out a window and noticed someone running from the rear door of Kathleen Weaver's house and into a barn located between the house and the hospital. Leonard described the person running as thin, about 5'4" tall with "hippie type" hair blowing in the wind, wearing a light-colored tee shirt and faded pants, and carrying something green. Leonard then saw feet protruding from the barn door as if the person had fallen inside.

The Davidson County Sheriff's Department was contacted at 10:34 a.m. while Leonard and Dr. Gregory Hedrick watched the barn. Sgt. Robert Henderson arrived about four minutes later and was told that no one had been seen leaving the barn.

Henderson and Lt. Ken Owens entered the barn and found defendant Randy Payne lying down in an upstairs loft. Defendant was wearing a light yellow tee shirt underneath a brown pullover shirt with a green collar. He also was wearing blue jeans. Owens noticed what looked like bloodstains on defendant's pants leg.

Henderson entered the Weaver house and found Kathleen Weaver, age sixty-nine, dead in her bedroom. Weaver was lying facedown on the floor with her head between the wall and the bed. Her legs were spread apart, and the pajamas she was wearing were split open at the crotch. The bed linens were disarrayed and heavily stained with blood. Henderson saw bloodstains on the back door handle, the back door curtains, and the floor leading through the kitchen and hall to the bedroom.

Chief Deputy Jim Johnson arrived and noticed pry marks and damage to the back door and a broken safety chain. Deputy Johnson then explored the barn and found a hatchet and two white athletic

socks, one of which was underneath a loose floorboard near the entrance to the barn. Blood and hair were on the hatchet; the sock under the floorboard was soaked with blood. These and items from the house and yard were gathered as evidence. When defendant was brought to jail, his clothes were taken by sheriff's deputies. Pursuant to a nontestimonial identification order, defendant surrendered head and pubic hair samples to the deputies.

Dr. Robert Anthony, a forensic pathologist, performed an autopsy. He noted wounds to the head, neck, and back of the victim, including one which penetrated the skull into the brain. The wounds were consistent with assault by a cleaver, machete, or hatchet. Dr. Anthony also noted several wounds on the left arm and both hands, which were likely defense wounds. Upon internal examination Dr. Anthony found the victim had received a blow to her abdomen that could have led to bleeding in her liver. The injuries and blood loss caused death, not immediately, but perhaps rapidly.

Dr. Anthony's autopsy also revealed that the victim's vagina had been penetrated, either shortly before her death or while her heart was still beating. He took samples of the victim's blood, head and pubic hair, and a vaginal swab, which he gave to the sheriff's department.

Forensic experts from the State Bureau of Investigation testified about their analyses of blood, fiber, and hair samples obtained from the victim, the victim's clothes, the defendant, the defendant's clothes, and the crime scene. Agent David Hedgecock testified that certain characteristics of blood samples from items taken from the barn were consistent with the characteristics of Weaver's blood groupings and these blood characteristics occurred in 1.3 percent of North Carolina's population. Agent John Bendure testified that a fiber taken from Weaver's backyard fence was consistent with fibers from defendant's brown pullover shirt; fiber on the hatchet found in the barn was consistent with fiber from the victim's pajamas; and a red fiber on defendant's brown pullover shirt was consistent with a red bathroom rug in the Weaver house. Agent Scott Worsham testified that one hair taken from Weaver's left hand was consistent with defendant's head hair; hairs taken from the hatchet were consistent with the victim's head hair; and the socks found in the barn loft and near the hatchet each yielded a hair consistent with the victim's head hair and a hair consistent with the victim's pubic hair.

STATE v. PAYNE

[328 N.C. 377 (1991)]

Defendant's evidence tended to show as follows: Defendant's mother, Violet Payne, testified that defendant had been drinking on the evening of 8 November 1983, and that she saw him asleep in the barn loft at approximately 10 p.m. that night. She said he was wearing the same clothes on 8 November 1983 as were taken from him on 9 November 1983.

Jeffrey Smith, an emergency medical technician, testified that he arrived at the Weaver home at 10:55 a.m. on 9 November 1983 and examined Weaver. Smith observed no pulse and noted that her body was cold, her blood had pooled to the extremities and rigor mortis had started. Dr. Anthony, the pathologist, estimated the time of death could have been as short as one hour or as long as eight hours before Smith's arrival.

The jury returned verdicts on 9 February 1988 finding defendant guilty of first degree rape and first degree murder. The first degree murder verdict was based on both the theory of premeditation and deliberation and the felony murder rule. On 10 February 1988 defendant moved that his court-appointed counsel be dismissed before the capital sentencing proceeding began. The trial court allowed the motion but ordered counsel to stand by at defendant's disposal during the sentencing proceeding.

At the sentencing proceeding neither the State nor defendant offered evidence. The State suggested and the trial court submitted to the jury only one aggravating circumstance: the murder was committed while defendant was engaged in the commission of the felony of first degree rape. N.C.G.S. § 15A-2000(e)(5) (1988 & Cum. Supp. 1990). The trial court, on its own motion, submitted two statutory mitigating circumstances: that defendant committed the murder "under the influence of mental or emotional disturbance" and that defendant's "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(2) and (6) (1988 & Cum. Supp. 1990). The trial court also instructed the jury that it could consider any other circumstance arising from the evidence which it deemed to have mitigating value.

The jury found the aggravating circumstance, did not find any mitigating circumstance, and recommended that defendant be sentenced to death. Defendant was sentenced to death for first degree murder and a mandatory term of life imprisonment for first degree rape.

STATE v. PAYNE

[328 N.C. 377 (1991)]

## II.

## A.

[1] Defendant first contends that the trial court abused its discretion in restricting individual *voir dire* of jurors, allowing defense counsel to question in detail only those individual jurors who responded to questions of the whole panel and seemed to favor the death penalty. We find no error.

The trial court allowed defense counsel to ask each juror individually whether that juror had any moral or religious scruples in favor of the death penalty. After defense counsel questioned each juror a second time about the death penalty, the trial court ruled as follows:

> The defense may examine the jurors with regard to any opinions they have which may predispose them to vote for the death penalty, but I am ruling that you may not ask a long series of questions to each of the twelve jurors, but you must ask the entire panel a question, and upon a positive response, you may pursue those positive responses. . . . It is simply more orderly, a more efficient, expedient way to examine the jurors.

The trial court's conduct of the jury selection process was well within its discretionary authority and did not violate N.C.G.S. § 15A-1214(c), which provides for the personal questioning of prospective jurors "individually concerning their fitness and competency to serve." The statute does not deprive the trial court of its authority to maintain appropriate supervision of the jury selection process by requiring counsel to address some generic questions to the entire jury panel, provided subsequent individual questioning is permitted when prompted by answers to the generic questions. *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980).

## B.

[2] Defendant next contends that because the trial court began the second day of jury selection before defendant was present in court, he is entitled to a new trial. We disagree.

At the beginning of the second day of jury selection, in defendant's absence, the trial court asked a new pool of additional prospective jurors, who had been summoned for defendant's trial, whether

**STATE v. PAYNE**

[328 N.C. 377 (1991)]

any of them lived outside of Iredell County[1]; had served as a juror during the last two years; was younger than eighteen years old; had been convicted of a felony; had difficulty hearing; had difficulty speaking or understanding English; had any illness or other reason he or she should not be required to serve on the jury. These preliminary questions were obviously designed to insure that the new prospective jurors were qualified to serve under N.C.G.S. § 9-3. Eight prospective jurors responded to this inquiry and were excused by the trial court prior to *voir dire* by counsel. Defendant was then brought into the courtroom and was present for the continuing petit jury selection process.

To conduct any portion of a capital trial in the defendant's absence deprives the defendant of the right to be present guaranteed by the confrontation clause of our State Constitution, N.C. Const. art. I, § 23. In a capital trial defendant may not waive this right. *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987). A violation of defendant's right to be present is, however, subject to harmless error analysis. *State v. Artis*, 325 N.C. 278, 297, 384 S.E.2d 470, 480 (1989), *sentence vacated*, 494 U.S. ---, 108 L. Ed. 2d 604 (1990).

Defendant argues that by not being present during the trial court's preliminary questioning of prospective jurors pursuant to N.C.G.S. § 9-3 he missed the opportunity to examine the demeanor and behavior of these prospective jurors, thereby hindering his ability to assist his counsel in the selection of the petit jury. Under *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990), this argument has some merit. We conclude the questioning of the jurors in defendant's absence erroneously deprived defendant of his right to be present at his trial, but we find the error to be harmless.

In *Smith* we held that a capital defendant's right to be present during all stages of trial attached to preliminary questioning in open court at, during and in the context of defendant's trial of newly summoned prospective jurors called specifically for service in defendant's trial. We held the trial court erroneously deprived defendant of this right to be present when it excused prospective jurors under these circumstances at *an unrecorded bench conference* with the jurors. *Id.* at 793, 392 S.E.2d at 363. We also held in

---

1. The jury pool was drawn from Iredell County, part of the same judicial district as Davidson County.

STATE v. PAYNE

[328 N.C. 377 (1991)]

*Smith* that the State failed to show the error was harmless because no transcript was made of the exchange and we could not surmise what was said or done or the reason for the juror's having been excused. *Id.* at 794, 392 S.E.2d at 363-64.

Here, defense counsel and a court reporter were present during the preliminary questioning of prospective jurors, and the trial transcript reveals all that was said. All prospective jurors who responded to the trial court's questions during defendant's absence were excused for unobjectionable reasons—recorded in the trial transcript—before the *voir dire* by counsel.[2] These facts are similar to those in *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855 (1988), *sentence vacated*, 494 U.S. ---, 108 L. Ed. 2d 601 (1990), in which the trial court examined jurors outside the presence of defendant but with a court reporter in attendance. We held it was error for the trial court to question jurors in defendant's absence; but, because the court reporter's transcript of the proceeding revealed that defendant's presence would have made no difference in the outcome, the error was harmless. *Id.* at 222-23, 372 S.E.2d at 863-64.

Whether this kind of error is harmless depends, we conclude, on whether the questioning of prospective jurors in defendant's absence might have resulted in a jury composed differently from one which defendant might have obtained had he been present and participated in the process. We are satisfied here beyond a reasonable doubt that defendant's absence during the preliminary questioning of prospective jurors did not result in the rejection of any juror whom defendant was entitled to have on the panel or the seating of any juror whom defendant was entitled to reject either for cause or peremptorily. Those potential jurors who were excused because of their responses to questions about statutory qualifications, physical infirmities, and personal hardships were either ineligible to serve or excused for manifestly unobjectionable reasons regardless of what defendant might have observed or desired. The remaining prospective jurors were available during selection of the petit jury, and defendant had sufficient opportunity to observe

2. The trial court excused the eight potential jurors for the following reasons: one had been sworn in to serve on a jury recently in Iredell County; two had difficulty hearing; one had ulcers; three cared for invalids at home; and one ran a business by himself.

STATE v. PAYNE

[328 N.C. 377 (1991)]

their demeanor and behavior in considering whether to accept or reject them.

## C.

[3] Defendant contends the prosecutor's reference during jury *voir dire* to certain aggravating circumstances upon which the State did not ultimately rely in the sentencing phase of the trial constituted prosecutorial misconduct warranting a new trial.

During selection of the petit jury, the following colloquy occurred:

PROSECUTOR: Aggravating factors are factors which operate in favor of the State. . . . One such aggravating factors [sic] would be, for instance, the capital felony was committed by a person lawfully incarcerated. Well, that's not—

DEFENSE COUNSEL: OBJECTION.

PROSECUTOR: —in this case—

TRIAL COURT: SUSTAINED.

PROSECUTOR: Well, if you want me to give the ones I'm relying on, that will be fine; . . . the State is relying on . . . the capital felony was committed while the defendant was engaged, or was an aider and abettor in the commission of, or attempt to commit, or flight after attempting to commit any homicide, robbery, rape or sex offense, arson, burglary, kidnapping—

DEFENSE COUNSEL: OBJECTION.

PROSECUTOR: That's one aggravating factor, if Your Honor please.

TRIAL COURT: OVERRULED.

PROSECUTOR: Thank you. That would be one of them. The capital felony that was committed was especially heinous, atrocious and cruel. That may be one of them that the State relies on.

During the sentencing phase of the case the State relied only on the underlying felony of rape to establish the aggravating factor provided in N.C.G.S. § 15A-2000(e)(5), "[t]he capital felony was committed while the defendant was engaged . . . in the commission

of . . . any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb." N.C.G.S. § 15A-2000(e)(5) (1988 & Cum. Supp. 1990). The trial court instructed the jury that it could find this aggravating factor only if the murder was committed while defendant was engaged in rape.

Defendant first contends he was prejudiced by the prosecutor's forecasting to the jury during *voir dire* that it might be called on to consider evidence of robbery, arson, burglary, or kidnapping when the prosecutor knew no evidence of those aggravating circumstances existed. We disagree.

It is not clear to us whether defendant's arguments in support of this assignment refer only to the sentencing proceeding or to both the guilt and sentencing proceedings. Insofar as this assignment relates to the sentencing proceeding, we need not discuss it because we are ordering a new sentencing proceeding for other reasons. Insofar as it relates to the guilt phase of the trial, we are confident the prosecutor's conduct was harmless.

It appears the prosecutor mentioned these offenses because they were listed in N.C.G.S. § 15A-2000(e)(5), the statutory subsection providing for the aggravating factor of committing murder during the commission of other listed offenses which include rape.

Nonetheless, a prosecutor during jury *voir dire* should limit references to aggravating factors, including the underlying felonies listed in N.C.G.S. § 15A-2000(e)(5), to those of which there will be evidence and upon which the prosecutor intends to rely.

Assuming the prosecutor's reference here to other underlying felonies was error, we conclude it is not of constitutional dimension. The burden is on defendant to show there is a reasonable possibility there would have been a different result at trial had the error not been committed. N.C.G.S. § 15A-1443(a) (1988 & Cum. Supp. 1990).

Defendant has failed to meet this burden. There was no further mention of these other crimes at the trial. The evidence of defendant's guilt of rape and murder was strong. The entire focus of the trial, including the evidence, final arguments, and the jury instructions related solely to these crimes and no others. We are confident there is no reasonable possibility that a different result would have obtained at trial had not the prosecutor mentioned these other crimes.

STATE v. PAYNE

[328 N.C. 377 (1991)]

**[4]** Defendant next contends the prosecutor engaged in misconduct by forecasting to the jury during *voir dire* that it might consider evidence of an especially heinous, atrocious or cruel killing as an aggravating factor when, at sentencing, the trial judge decided not to submit that factor. We conclude no misconduct occurred.

To the extent that such statements are allowed at all, it is permissible for a prosecutor during jury *voir dire* to state briefly what he or she anticipates the evidence may show, provided the statements are made in good faith and are reasonably grounded in the evidence available to the prosecutor, as may be later revealed by evidence actually adduced. Evidence for the State tended to show that Weaver sustained multiple stab wounds, including several defensive wounds. Even if this evidence was not sufficient, as the trial court finally ruled, to sustain submission of the especially heinous aggravating factor, a question we do not address, the case is not so lacking in evidentiary support for this factor that it was impermissible for the prosecutor to forecast reliance on it at the outset of the trial.

D.

**[5]** Defendant contends the trial court committed reversible error by allowing the prosecutor over defendant's objection to seat members of the victim's family behind the prosecution table and within the bar of the courtroom during the trial. We find no merit in this assignment of error.

Before trial, defendant moved to prohibit the prosecutor from seating members of the victim's family inside the bar and immediately behind the prosecution table. The trial court denied the motion. During trial, members of the victim's family sat within the bar and immediately behind the prosecution table. The prosecutor did not identify those persons to the jury.

Defendant first argues that seating members of the victim's family inside the bar and close to the jury violates the principle of *Booth v. Maryland*, 482 U.S. 496, 96 L. Ed. 2d 440, *reh. denied,* 483 U.S. 1056, 97 L. Ed. 2d 820 (1987). *Booth* held introduction of a victim impact statement at the sentencing proceeding in a capital murder case violates the eighth amendment. *Id.* at 509, 96 L. Ed. 2d at 452. In *State v. Laws*, 325 N.C. 81, 102-03, 381 S.E.2d 609, 622 (1989), *sentence vacated,* 494 U.S. ---, 108 L. Ed. 2d 603 (1990), this Court held the prohibition of victim impact

statements in *Booth* did not extend to a prosecutor's statement identifying members of the victim's family in the courtroom at the beginning of a capital trial. In the present case, the prosecutor made no mention of the victim's family and did not identify family members sitting inside the bar. We decline to extend *Booth*'s holding to restrict, as a matter of law, where in a courtroom unidentified family members of the deceased may be seated in the courtroom during a murder trial.

Defendant further argues that seating members of the victim's family inside the bar runs afoul of this Court's decisions which caution against arguing for a verdict of guilt on the basis of the crime's impact on the victim's family. In *State v. Brown*, 320 N.C. 179, 202-03, 358 S.E.2d 1, 13, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987), this Court held a prosecutor's argument that jurors should find defendant guilty in order to grant justice to the victim's family was not so improper as to require the trial court to correct it *ex mero motu* in the absence of an objection by defendant. Similarly, in *State v. Cummings*, 323 N.C. 181, 192, 372 S.E.2d 541, 549 (1988), *sentence vacated*, 494 U.S. ---, 108 L. Ed. 2d 602 (1990), this Court held that a prosecutor's statement about the victim's family members was not so improper as to require the trial court to intervene *ex mero motu*. Nevertheless, we emphasized that "[a]rguments emphasizing mercy, prejudice, pity, or fear are inappropriate in the guilt phase of the trial, in which the jury's focus is properly upon guilt or innocence." *Id.*

Merely seating members of the victim's family, not identified as such, behind the prosecutor's table and within the bar of the court does not violate the principles enunciated in *Brown* and *Cummings*.

Defendant has cited no authority, and we have found none, which finds this circumstance to be error. Where particular persons who are witnesses or who have an interest in the outcome of a trial sit in the courtroom is a matter left to the trial judge's discretion. We find no abuse of that discretion here.

E.

[6] Defendant next contends the trial court committed reversible error by continuing the trial after it discovered the jury had been transported by an unsworn deputy in violation of N.C.G.S. § 15A-1236(c). The statute provides:

If the jurors are committed to the charge of an officer, he must be sworn by the clerk to keep the jurors together and not to permit any person to speak or otherwise communicate with them on any subject connected with the trial nor to do so himself, and to return the jurors to the courtroom as directed by the judge.

N.C.G.S. § 15A-1236 (1988 & Cum. Supp. 1990).

During the fifth day of defendant's trial, the bailiff who originally had been assigned to transport jurors and was properly sworn was disabled. Another deputy was then assigned that task and transported jurors without having been sworn. Upon discovering this, the trial court asked the deputy several questions for the record. The deputy stated that when he transported the jury, he knew nothing about the case except defendant's name, and that he had not discussed the facts or circumstances or proceedings of the case with any jury member. The trial court then swore in the deputy according to the statute. Defendant neither objected to this procedure nor did he move for a mistrial.

By failing to object or move for a mistrial in regard to the unsworn deputy, defendant has waived his right to have this issue considered on appeal. N.C.G.S. § 15A-1446(b) (1988 & Cum. Supp. 1990). *State v. McDougall*, 308 N.C. 1, 9, 301 S.E.2d 308, 317, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). Nonetheless, since this is a capital case, we will address the issue.

Defendant does not contend that his case was affected by the unsworn deputy, but argues that this error should be conclusively presumed prejudicial under *State v. Mettrick*, 305 N.C. 383, 385, 289 S.E.2d 354, 356 (1982). In *Mettrick* we held that prejudice should be conclusively presumed when jurors were transported by deputies who were witnesses for the State. In the case before us the deputy in question was not a witness for the State and was in no way involved in the prosecution. The error in *Mettrick* was permitting jurors to be transported by state's witnesses. The error here is that jurors were transported by a deputy who was not sworn. The appearance of impropriety which prompted our decision in *Mettrick* obviously does not exist here, and prejudice will not be presumed. We find the error to be clearly harmless, entitling defendant to no relief.

F.

[7]   Defendant next contends the trial court erred in denying his motion to suppress the evidence of his clothes seized from defendant on the day of his arrest.[3] We disagree.

Before trial, defendant moved to suppress evidence of his clothes seized by law enforcement officers several hours after his arrest. The trial court conducted a lengthy *voir dire* hearing. Evidence presented on *voir dire* tended to show the following pertinent facts:

Defendant was arrested between 10:30 and 11 a.m. on 9 November 1983 near the scene of the crime. An officer advised defendant of his rights. Another officer held defendant at the back of the victim's yard while officers gathered evidence inside the victim's home. At approximately 11 a.m. Deputy Hedrick drove defendant to the Davidson County Courthouse and Sheriff's Department. There, a sheriff's detective, Jim Johnson, interrogated defendant for a few minutes until defendant said he would talk no more without a lawyer present. Deputies then took defendant before a magistrate, charged him with first degree murder, and returned defendant to a detective's office. Lt. Richard Sink, who had collected evidence at the crime scene earlier that day, arrived soon thereafter, sometime between one and three o'clock in the afternoon. Another detective ordered defendant to remove his clothing and placed it in a bag that Sink held open. Sink then fastened a label on the bag for custodial purposes. Deputies provided defendant with an orange jumpsuit from the jail. Defendant's clothes were taken within five hours of his arrest.

After finding facts according to this evidence, the trial court concluded that the seizure of defendant's clothing was incident to a lawful arrest and inventory procedure and did not violate defendant's constitutional right against unreasonable searches and seizures under the fourth and fourteenth amendments.

Because his clothes were not taken from him at the crime scene at the time of arrest, defendant argues, their seizure was so remote from the arrest as to require a warrant. Defendant

---

3. Although defendant's assignment of error forming the basis for this argument mentions a statement taken from him while in police custody and before his appearance before the magistrate, defendant's brief does not present or discuss any argument about his statement. Thus, this assignment of error is deemed abandoned under Rule 28(a) of the North Carolina Rules of Appellate Procedure.

does not contend that his arrest was unlawful. This issue is controlled adversely to defendant by *United States v. Edwards*, 415 U.S. 800, 39 L. Ed. 2d 771 (1974), in which the United States Supreme Court upheld the seizure without a warrant of clothes taken from a suspect the morning after his arrest.

In *Edwards* the defendant was arrested late at night on a charge of attempted breaking and entering and placed in a jail cell. Contemporaneously or shortly after the arrest, officers discovered paint chips on a windowsill where the illegal entry was attempted. The next morning officers seized defendant's clothing and matched paint chips from the clothing with paint chips on the windowsill. Defendant contended that neither the clothing nor the evidence found on it were admissible because the clothes had been taken in violation of his fourth amendment rights. The Supreme Court upheld the seizure and use of the evidence. The Court cited *United States v. Caruso*, 358 F.2d 184 (2nd Cir.), *cert. denied*, 385 U.S. 862, 17 L. Ed. 2d 88 (1966), for the principle that

> once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.

*Id.* at 807, 39 L. Ed. 2d at 778. The Court noted that on the night of defendant's arrest and on the following day when police seized the clothing,

> the police had lawful custody of Edwards and necessarily of the clothing he wore. When it became apparent that the articles of clothing were evidence of the crime for which Edwards was being held, the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered.

*Id.* at 805, 39 L. Ed. 2d at 777.

In the present case, as in *Edwards*, police arrested defendant and kept him in lawful custody for several hours before seizing as evidence the clothing he was wearing when arrested. Defendant attempts to distinguish *Edwards* by noting the police in that case

delayed taking defendant's clothes until the next day because they could not obtain substitute clothing before that time. Defendant argues that no such reason for delay existed in this case because jail officials had a suit for him at the time of his arrest. The reason for the delay was not, however, dispositive in *Edwards*. The Court emphasized that on the day defendant's clothes were taken and submitted for laboratory analysis, the police had already taken lawful custody of them by virtue of arresting defendant. "Indeed, it is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." *Id.* at 806, 39 L. Ed. 2d at 777. Following that same reasoning, we hold that the seizure of clothing in this case was not unreasonable, and the trial court did not err in denying defendant's motion to suppress the evidence.

[8] Defendant further argues that his clothes were taken as a result of what he contends was an unnecessarily long delay in his appearance before a magistrate in violation of N.C.G.S. § 15A-501 (2). This statute requires police to "take the person arrested before a judicial official without unnecessary delay." N.C.G.S. § 15A-501 (1988 & Cum. Supp. 1990). N.C.G.S. § 15A-974 provides that upon timely motion, evidence must be suppressed if it "is obtained as a result of a substantial violation of the provisions of this Chapter." N.C.G.S. § 15A-974 (1988 & Cum. Supp. 1990).

Testimony on *voir dire* indicated that defendant was arrested between 10:30 and 11 a.m. on 9 November 1983 and taken to the detective's office. He was taken before a magistrate at approximately noon, charged with murder, and then returned to the detective's office. Thereafter his clothing was taken sometime between 1 and 3 p.m. None of defendant's clothing was taken before his appearance before the magistrate.

Defendant's argument obviously has no merit. First, there is no showing that there was any unnecessary delay between his arrest and his appearance before the magistrate. Second, even if there was an unnecessary delay, there was no showing that the taking of his clothes was obtained as a result of it. *State v. Richardson*, 295 N.C. 309, 245 S.E.2d 754 (1978).

## G.

[9] Defendant also contends the trial court erred in denying his motion to suppress evidence of hair samples taken in compliance

with a nontestimonial identification order entered pursuant to N.C.G.S. § 15A-271.

After he was charged with first degree murder before the magistrate and returned to a detective's office, defendant was served with a nontestimonial identification order requiring him to furnish investigators samples of his head and pubic hair. An officer then handed defendant a pair of clean scissors and asked defendant to trim some of his head hair and pubic hair. Defendant complied. Although defendant argues that this seizure was unconstitutional because it unreasonably intruded on his privacy, this Court has long recognized that the taking of hair samples in this manner is reasonable and not constitutionally infirm. *See, e.g., State v. Reynolds*, 298 N.C. 380, 401, 259 S.E.2d 843, 855 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 795 (1980); *State v. Sharpe*, 284 N.C. 157, 163, 200 S.E.2d 44, 48 (1973).

H.

[10]   Defendant next assigns error to the admission of certain opinion testimony given by a serologist.

State Bureau of Investigation Agent David Hedgecock, an expert in the field of blood analysis, stated that approximately one percent of North Carolinians have the same blood characteristics as the victim. Defense counsel objected on the ground the State had not established the opinion was based on current authorities relied on by experts in the field of blood analysis. The trial court overruled the objection and defendant contends this was error.

There was no error in this ruling. North Carolina Rule of Evidence 703, N.C.G.S. § 8C-1, provides that an expert may base his opinion on facts or data not otherwise admissible if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences. . . ." N.C.G.S. § 8C-1, Rule 703 (1988 & Cum. Supp. 1990). Agent Hedgecock testified that his opinion was based on statistics from SBI studies conducted between 1979 and 1983 and from scientific journals, both of which he testified are generally relied on by other experts in his field. Agent Hedgecock's testimony laid a sufficient foundation to support admission of his expert opinion. N.C.G.S. § 8C-1, Rule 703 (1988 & Cum. Supp. 1990); *State v. Allen*, 322 N.C. 176, 184, 367 S.E.2d 626, 630-31 (1988); *State v. Huffstetler*, 312 N.C. 92, 107-08, 322

S.E.2d 110, 120 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985).

Nor do we find merit in defendant's argument that the trial court improperly allowed Agent Hedgecock to estimate how many blood analyses he had performed in his career. This evidence was relevant to the issue of the witness's experience. *See State v. Graham*, 35 N.C. App. 700, 703-04, 242 S.E.2d 512, 514 (1978).

## I.

[11] Defendant next assigns error to the admission of testimony comparing carpet fibers from his residence with fibers found on his clothing the day of his arrest.

State Bureau of Investigation Agent John Bendure, an expert in forensic fiber examination, testified that a red fiber from defendant's shirt was microscopically consistent with fiber from a rug in the victim's home and microscopically inconsistent with fiber taken forty-nine days after the crime from carpet in defendant's residence. The comparison with carpet fiber from defendant's home was offered to eliminate that carpet as a possible source of the fiber.

Sgt. Sam Hampton of the Davidson County Sheriff's Department testified that he visited defendant's home on 28 December 1983 and collected carpet samples from the living room and from defendant's mother's bedroom. One sample was a reddish fiber that Sgt. Hampton marked as having been taken from the living room carpet. Sgt. Hampton testified on cross-examination that he did not know if the carpet had been in defendant's home at the time of the murder.

Defendant argues that because the carpet fiber sample was not taken until more than a month after the crime, and because the State did not establish the carpet was in defendant's residence at the time of the crime, the comparison was irrelevant and should not have been allowed. We disagree.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988 & Cum. Supp. 1990). This Court has held that evidence is relevant if it has "*any* logical tendency, however slight, to prove a fact in issue in the case." *State v. Perry*, 298 N.C. 502, 510, 259 S.E.2d 496,

501 (1979); *accord State v. Hannah*, 312 N.C. 286, 294, 322 S.E.2d 148, 154 (1984). Evidence that the fiber on defendant's shirt was not consistent with fiber from carpet samples taken from defendant's home has some logical tendency to show that the source of the fiber was not this carpet.

The State need not prove by direct evidence that the red carpet was in defendant's home at the time of the crimes as a prerequisite to introducing the carpet fiber and comparison as evidence. It is common knowledge that homeowners do not change or replace carpets as frequently as once every several months. Nothing else appearing, a jury could reasonably infer, because it is more probable than not, that a carpet was in a home within several months before and after the time it was actually found there. That there was no direct evidence that the carpet was in fact in defendant's home at the time of defendant's arrest goes to the weight of the evidence rather than its admissibility. *State v. Simpson*, 327 N.C. 178, 191, 393 S.E.2d 771, 779 (1990).

J.

[12] Defendant next argues the trial court committed prejudicial error in allowing the State to introduce certain testimony by an expert in hair analysis.

S.B.I. Agent Scott Worsham testified about "limited characteristics" of similarity between hairs found on defendant's tee shirt and hair of the victim, and between hairs found on the victim's panties and defendant's head hair. He found a hair with limited identifiable characteristics on a tee shirt worn by defendant. The limited characteristics present in one hair from the shirt were consistent with the victim's hair. Agent Worsham examined hairs taken from panties Weaver was wearing when her body was found. One of those hairs was "limited in microscopic characteristics and, therefore, I chose not to draw any conclusions as to who it may have, or could have originated from." When asked whether that hair's limited characteristics were similar to defendant's pubic hair or head hair, Agent Worsham responded that one or more characteristics was similar to defendant's head hair.

Defense counsel unsuccessfully objected to this testimony. Defendant contends that because Agent Worsham could not conclusively determine the origins of the hairs found on defendant's shirt and

the victim's panties, his testimony had so little probative value that it was error for the trial court to admit it.

We rejected a similar argument in *State v. Perry*, 298 N.C. 502, 259 S.E.2d 496 (1979). In *Perry* the defendant assigned error to the trial court's refusal to exclude expert testimony that blond hairs found on the murder victim's sweater had microscopic characteristics similar to head hairs taken from defendant. *Id.* at 510, 259 S.E.2d at 501. On cross-examination, the witness stated that although the hairs were similar, the number of characteristics they shared was "limited." We upheld the introduction of the testimony despite the expert's tentative conclusion, in light of other evidence that tended to place the defendant at the crime scene. *Id.* at 511, 259 S.E.2d at 501. The other evidence included evidence that someone of the defendant's blood type raped the victim, that the defendant was in the victim's presence at the time she disappeared, and that defendant's gun was the murder weapon. *Id.*

Here, too, there is other evidence tending to place defendant at the crime scene. Defendant's attempts to distinguish *Perry* by arguing that here the State's other evidence against defendant is weaker than in *Perry* is unpersuasive. Under *Perry* the evidence in this case was relevant and admissible.

Defendant also argues this case differs from *Perry* in that Agent Worsham expressly testified that the microscopic characteristics he observed were insufficient for him to form an opinion regarding the hairs' origins. This distinction also is unpersuasive. Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988 & Cum. Supp. 1990). "On the other hand, evidence which has no tendency to prove a fact in issue in the case is inadmissible." *Perry*, 298 N.C. at 510, 259 S.E.2d at 501. An individual piece of evidence need not conclusively establish a fact to be of some probative value. It need only support a logical inference of the fact's existence.

Applying Evidence Rule 401, we cannot conclude the challenged testimony has no tendency to prove a fact in issue. Agent Worsham's testimony that a head hair found on the victim's panties had some characteristics, albeit limited, inconsistent with the victim's hair tends to make the sexual assault upon the victim more probable. *See State v. McNicholas*, 322 N.C. 548, 553, 369 S.E.2d

569, 572 (1988). His testimony that the hair had some characteristics, albeit limited, consistent with defendant's head hair tends to make defendant's contact with the victim more probable. That the characteristics identified in the hair could be consistent with hair from persons other than defendant or the victim goes to the weight, not the admissibility, of this evidence. *State v. Short*, 322 N.C. 783, 792, 370 S.E.2d 351, 356 (1988).

## K.

**[13]** Defendant next contends that he deserves a new trial because the prosecutor asked inflammatory questions concerning inadmissible evidence.

The prosecutor asked defendant's mother about locks she had placed on the outside of defendant's bedroom door. The prosecutor also asked defendant's mother, "you were afraid of him, weren't you?" The trial court sustained defense counsel's objection, but not before the witness responded that she was not afraid of her son. The prosecutor then repeatedly questioned her about the locks, despite objections by defense counsel that were sustained by the trial court. At one point, when defense counsel objected and said the question was irrelevant, the prosecutor replied, "No, it's not. I want to know why she's got a lock on her son's door." After that objection, too, was sustained by the trial court, the prosecutor continued:

PROSECUTOR: So, in any event, there were at least two locks on this door, inside —

DEFENSE COUNSEL: OBJECTION, asked and answered.

PROSECUTOR: — and out.

DEFENSE COUNSEL: OBJECTION.

PROSECUTOR: I don't think there's anything wrong with that question.

COURT: SUSTAINED.

The prosecutor's questions and statements concerning locks on defendant's door and whether his mother feared him were clearly improper and the trial court properly and consistently sustained objections to them. This information, highly prejudicial and of no probative value, suggested only that defendant was dangerous to

others. It was prohibited by Evidence Rule 404(a). N.C.G.S. § 8C-1, Rule 404(a) (1988 & Cum. Supp. 1990).

Cross-examination by which an attorney attempts to place before the jury inadmissible and prejudicial evidence is improper and, if knowingly done, unprofessional. *State v. Britt*, 288 N.C. 699, 712, 220 S.E.2d 283, 291 (1975), *later app.* 291 N.C. 528, 231 S.E.2d 644 (1977); *State v. Daye*, 281 N.C. 592, 596, 189 S.E.2d 481, 483 (1972); North Carolina State Bar, *Rules of Professional Conduct* Canon VII, Rule 7.1(A)(1) (1990); *cf.* American Bar Association, *Model Rules of Professional Conduct*, Rule 3.4(e) (1990); American Bar Association, Project on Standards for Criminal Justice, *Standards Relating to Prosecution Function and the Defense Function*, § 3-5.6(b) at 81 (1980).

Had this case been closer on the question of defendant's guilt, we would have difficulty upholding the trial in face of the prosecutor's improper cross-examination. That the trial court sustained defendant's objections and defendant's mother testified she was not afraid of her son lessened the prejudice that might otherwise have occurred. The properly admitted evidence against defendant was strong. We can, therefore, conclude that defendant has not met his burden of showing a reasonable possibility that there would have been a different result at trial had the prosecutor's improper cross-examination not been committed. N.C.G.S. § 15A-1443(a) (1988 & Cum. Supp. 1990).

## L.

[14] Defendant contends the trial court erred in denying defendant's motion after all evidence was presented to dismiss the charge of first degree murder for insufficiency of evidence. We hold the evidence was sufficient to be submitted to the jury.

Defendant argues that an inference of his innocence arises from the State's evidence more readily than an inference of his guilt. He contends the blood, hair, and fiber transfers the State's evidence tends to show occurred between himself and the crime scene likely occurred at times before and after the crime, as when he walked through Weaver's yard the day before the crime or when deputies escorted him through bloody leaves in the yard after arresting him. Defendant hypothesizes that fiber from the victim's house could have been transferred to his shirt by deputies who investigated the crime scene and then collected his clothing,

and that hair from his head could have been transferred to the victim's hand by Lt. Sink, who handled the body after inspecting the barn that defendant frequently inhabited.

Defendant contends that certain anomalies in the State's evidence conflict with an inference of his guilt, rendering an inference of his innocence more plausible by comparison. He first notes that Frances Leonard, who was familiar with defendant, who had seen him the day before the killing in Weaver's yard, and who had ample opportunity to observe the person fleeing Weaver's home shortly after the crimes, failed to identify that person as defendant. Leonard described the person fleeing as having characteristics consistent with defendant's general appearance and stated that the person was wearing a yellow or light-colored tee shirt. Defendant notes that the yellow tee shirt in his possession was covered on the front with a dark screen-printed design. He argues, based on that conflicting detail, that the person Leonard saw leaving the Weaver home must have been someone else.

Defendant also notes that a serologist who identified semen in a sample of fluid from the victim's vagina failed to identify blood in that sample as blood of defendant. The serologist testified that because the vaginal swab contained a mixture of vaginal fluid and seminal fluid, he could not isolate foreign blood groupings for identification.

Defendant concludes that the circumstantial evidence in this case leads most logically not to an inference of his guilt but to the conclusion that blood, hair, and fibers linking him and the victim were inadvertently transferred by the path of the real killer fleeing through the barn or by police officers investigating both the Weaver home and the barn. He argues, therefore, that the trial court should have granted his motion to dismiss the charge of first degree murder.

We disagree. Defendant's arguments on this issue are more properly for the jury, not the court. They go to the weight of the evidence, not its sufficiency. In considering a motion to dismiss, the trial court is to consider the evidence in the light most favorable to the State, to resolve all conflicts and draw every reasonable inference in favor of the State. *State v. Snead*, 295 N.C. 615, 617-18, 247 S.E.2d 893, 895 (1978). "To hold that the court must grant a motion to dismiss unless, in the opinion of the court, the evidence excludes every reasonable hypothesis of innocence would in effect

constitute the presiding judge the trier of facts." *State v. Stephens*, 244 N.C. 380, 383-84, 93 S.E.2d 431, 433 (1956).

A trial court properly denies a motion to dismiss when there is sufficient evidence from which a rational trier of fact may find beyond a reasonable doubt the existence of every essential element of the crime charged. *State v. McCoy*, 303 N.C. 1, 24, 277 S.E.2d 515, 532 (1981). As is the case here,

> [w]hen the motion for nonsuit calls into question the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty.

*State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965).

It is clear that the circumstantial evidence in this case is sufficient to enable a rational jury to find defendant was the perpetrator of the crimes for which he was convicted. The evidence that defendant cites as anomalous to his guilt simply raised a conflict for the jury to resolve. That other inferences could be drawn is not sufficient to require dismissal of the charges.

M.

[15] Defendant next contends that he is entitled a new trial because the prosecutor during his closing argument repeatedly and deliberately misrepresented to jurors that a hair from defendant's head was found underneath one of the victim's fingernails.

Dr. Robert Anthony, a forensic pathologist, testified that a hair from defendant's head was retrieved either from under the fingernail or from the back of the victim's hand. The exact origin could not be determined because scrapings from both locations were placed in the same evidence bag. The prosecutor argued to the jury the only way defendant's hair could have gotten under the victim's fingernail was by her efforts to defend herself against him. Defendant did not object to this argument at trial.

Because defendant did not object at trial to the prosecutor's argument, the question is whether the argument was so grossly improper that the trial court abused its discretion in not recognizing and correcting the impropriety *ex mero motu. State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). While the prosecutor's

argument was not altogether supported by the evidence because the pathologist could not say exactly where on the victim's hand the hair was found, the pathologist did say the hair came from either the back of the victim's hand or underneath a fingernail. We conclude, therefore, that the statement did not so grossly contradict the evidence as to require the trial court to recognize the discrepancy and intervene *ex mero motu*.

## N.

[16] Defendant finally argues that he deserves a new trial because of the prosecutor's inflammatory and prejudicial remarks urging the jury to find defendant guilty in order to prevent him from committing more crimes. The prosecutor argued as follows during the guilt phase of the trial:

> The law is for your protection, and the only way that you can be sure that this crime will never be perpetrated again by Randy Payne is to find him guilty of first degree murder by reason of premeditation and deliberation, and find him guilty of rape in the first degree. . . . But if you don't think he's guilty, you go right back in there and turn him loose, and we'll give him Mrs. Weaver's hatchet back —

Defense counsel objected, but the prosecutor continued, "and, let him go and kill somebody else," before the trial court sustained the objection. The trial court then instructed jurors not to consider the argument.

To argue that a defendant, if acquitted, will commit a future crime is improper. *State v. Zuniga*, 320 N.C. 233, 257, 357 S.E.2d 898, 914, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987). Juries should be urged to convict on the basis of the evidence tending to show guilt, not on the basis of emotional appeals to jurors' fears. *State v. Cummings*, 323 N.C. 181, 372 S.E.2d 541 (1988), *sentence vacated*, 494 U.S. ---, 108 L. Ed. 2d 602 (1990). The trial court properly sustained the objection and instructed the jurors not to consider the argument. We must assume the jury followed this instruction and the instruction cured the improper argument. *Cf. State v. Covington*, 290 N.C. 313, 328-29, 286 S.E.2d 629, 641 (1976); *Zuniga*, 320 N.C. at 257, 357 S.E.2d at 914.

## III.

We now turn to capital sentencing issues.

[17]   The trial court instructed the jury to find unanimously each mitigating circumstance before considering that circumstance in the ultimate sentencing decision. This instruction was error under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369, *on remand*, 327 N.C. 31, 394 S.E.2d 426 (1990). Such error requires us to order a new sentencing hearing unless the State can demonstrate beyond a reasonable doubt that it was harmless. *State v. McNeil*, 327 N.C. 388, 393, 395 S.E.2d 106, 110 (1990); *State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990).

Defendant did not present any evidence in the sentencing phase of his trial. However, based on evidence presented during the guilt phase, the trial court submitted the following mitigating factors to the jury for its consideration: the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6), and, pursuant to N.C.G.S. § 15A-2000(f)(9), any other circumstance arising from the evidence which the jury might deem to have mitigating value. After receiving instructions from the trial court that since have been held to constitute *McKoy* error, the jury found no mitigating circumstance.

This Court has encouraged trial courts to hold defendants to a low burden of production when determining whether to submit a mitigating circumstance for jury consideration. In *State v. Pinch*, 306 N.C. 1, 27, 292 S.E.2d 203, 223, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled in part on other grounds*, *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), we held that "common sense, fundamental fairness and judicial economy dictate that any reasonable doubt concerning the submission of a statutory or requested mitigating factor be resolved in the defendant's favor to ensure the accomplishment of complete justice . . . ." We endorsed a similar approach in *McKoy*, recognizing "the constitutional importance of preserving the jury's ability to consider under proper instructions all evidence proffered by a capital defendant that could reasonably mitigate the sentence to something less than death." *McKoy*, 327 N.C. at 44, 394 S.E.2d at 433.

On this appeal we need focus only on the impaired capacity mitigating circumstance. There was evidence tending to support this circumstance. One witness testified that on more than one

STATE v. PAYNE

[328 N.C. 377 (1991)]

occasion before November 1983 she had seen defendant inhaling gasoline from a can, stumbling, and talking as if he believed another person were with him, although he was alone.[4] Defendant's mother testified that her son had been drinking alcohol the night before the victim's body was found. This evidence, considered with testimony that sheriff's deputies found defendant smelling like beer and lying in a barn loft strewn with a gasoline can and several beer cans, could support a reasonable inference that defendant was intoxicated at the time of the crime and, as a result, his ability to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was impaired. *State v. Quesinberry*, 328 N.C. 288, 401 S.E.2d 632 (1991).

We cannot say beyond a reasonable doubt that absent the unanimity instruction no juror could have found the existence of this mitigating factor, weighed it in the final balancing process in deciding between life imprisonment and death and, having done so, concluded that life imprisonment should have been imposed. The potential prejudice from improper instructions on this mitigating factor is considerable because the factor is statutory and, therefore, deemed to have mitigating value. *Id.* at 293, 401 S.E.2d at 634; *Pinch*, 306 N.C. at 27, 292 S.E.2d at 224.

We therefore vacate the sentence of death and remand to Superior Court, Davidson County, for a new sentencing proceeding in the first degree murder case.

For the reasons given, we find no error in the rape case and remand the murder case to the Superior Court, Davidson County, for a new sentencing proceeding not inconsistent with this opinion or the opinion of the United States Supreme Court in *McKoy*.

Case No. 83CRS16747 — no error.

Case No. 83CRS16387 — new sentencing proceeding.

---

4. Frances Leonard, an employee of Davidson Animal Hospital who recognized defendant after sheriff's deputies brought him out of the barn, testified that she had observed this behavior by defendant near the barn and the animal hospital on more than one occasion. Although Mrs. Leonard did not testify that she saw defendant inhaling gasoline close to the date of the killings, her testimony is relevant in light of other evidence discussed in the text.