STATE OF NORTH CAROLINA v. TERRY FRANKLIN SHARPE

No. 28

(Filed 14 November 1973)

Criminal Law § 84; Searches and Seizures § 1— warrantless seizure of hair samples — constitutionality

The seizure of hair samples from defendant's head and arm without a warrant while defendant was in custody pursuant to a lawful arrest on a murder charge was not unreasonable and did not violate the Fourth Amendment to the U. S. Constitution, and expert testimony concerning a comparison of the hair so taken with hair taken from under the fingernail of the victim was properly admitted in defendant's trial for first degree murder.

APPEAL by defendant from *Grist, J.,* at the 1 January 1973 Schedule "B" Session of MECKLENBURG Superior Court.

Defendant was tried on two indictments, proper in form, charging him with armed robbery and murder in the first degree of Thomas Ross Garrison on 15 July 1972. At the end of the State's evidence, the trial court allowed defendant's motion for judgment as of nonsuit for the armed robbery charge, but retained the lesser included offense of common law robbery. Defendant was not tried for first degree murder under the felony-murder rule, but rather the State undertook the burden of proving premeditation and deliberation. The jury found defendant guilty of first degree murder and common law robbery, and defendant was sentenced to life imprisonment for the murder and to 10 years' imprisonment for the robbery, the 10-year sentence to commence at the expiration of the life sentence. From the judgments imposed, defendant appealed. Pursuant to G.S.

7A-31(a), the case on the robbery charge was certified for review by this Court prior to determination by the Court of Appeals.

At trial it was undisputed that during the early morning of 15 July 1972 Thomas Ross Garrison, a crippled polio victim, was killed in Charlotte, North Carolina. The scene of the crime was a dead-end road in an uninhabited portion of a residential development under construction. A Charlotte police officer on patrol in the area observed a car on fire and proceeded to investigate. He found the deceased's body and a bumper jack in some nearby bushes at the end of a trail of blood leading from a partially burned automobile later identified as belonging to the deceased. The deceased's head had recently been crushed and his upper body had received multiple blows. The police also found a charred portion of a shirt sleeve at the scene of the crime, which defendant admitted was torn from his shirt.

Shortly before the killing the deceased had been seen with two young men in a different part of Charlotte by another police officer and Johnny Ray Miles. Miles identified the two men that he had seen with the deceased as defendant and Jerry Vonn Trull. Trull was a friend of defendant who had been living with defendant's parents for a couple of weeks prior to 15 July 1972.

On the afternoon of 15 July 1972 a Charlotte police detective went to defendant's home. There defendant's mother, Mrs. Beatrice Sharpe, informed the police that her son and Trull came home early that morning without their shirts and with blood all over their other clothes. They told her that they had been in a fight with some black males, and that this explained the blood on their clothing. Mrs. Sharpe gave these clothes to the police. While at defendant's home the police also learned that defendant and Trull had gone to Myrtle Beach, South Carolina.

On the evening of 15 July 1972 defendant and Trull were arrested in Myrtle Beach, South Carolina, and taken to the Charlotte Police Department the following morning. Shortly after they were returned to Charlotte, venous puncture blood samples, head and arm hair samples, and fingernail scrapings were taken from them, over their attorney's objections and without a search warrant.

Prior to the State's calling this case for trial, Trull pleaded guilty to second degree murder. He then testified for the State. The State's evidence, based largely on Trull's testimony, tends

State v. Sharpe

to show that during the early morning of 15 July 1972 defendant and Trull were in Charlotte in front of the home of Johnny Ray Miles. While they were there a car driven by the deceased pulled up along the curb and stopped. Defendant went over and talked with the deceased and persuaded him to take defendant and Trull to defendant's home. Pretending to direct the deceased to defendant's home, defendant instead directed him to a dead-end road in an uninhabited portion of a residential development under construction. There defendant took the deceased's car keys out of the ignition switch, knocked the deceased out of his car, got a bumper jack out of the trunk, and hit the deceased several times. Defendant then took approximately $30 from the deceased's person. He and Trull then dragged the body into some nearby bushes. Defendant threw the bumper jack into the bushes, set the deceased's car seat on fire, and he and Trull left the area and went to defendant's home.

The State introduced into evidence the blood-stained clothing belonging to defendant and Trull that defendant's mother had given to the police. Mrs. Mary Jane Burton, an employee of the Mecklenburg County Law Enforcement Crime Laboratory and an expert in the field of typing and comparison of human blood, testified that the blood on the clothing was of the same type as that of the deceased. This same witness was also offered by the State as an expert in the field of comparison of human and animal hairs. She testified that she had taken fingernail scrapings and hair samples from the deceased's body, and that the fingernail scrapings revealed the presence of dirt, blood, and a single hair. Based on her observations of this hair under a microscope, Mrs. Burton offered the following opinions: the hair taken from under the deceased's fingernails was a human hair from a Caucasian and was a "limb hair," meaning that it was from a leg, arm, or hand; it was not similar to an arm hair taken from the deceased or to an arm hair taken from Trull, but was similar to an arm hair taken from defendant.

Medical testimony for the State revealed that the deceased died as a result of a massive head injury from multiple blows from a blunt object, and that the bumper jack found at the scene of the crime could have caused the injury.

Defendant testified in his own behalf. He admitted that he had been expelled from East Mecklenburg High School six or seven times and that he had been convicted of larceny on one occasion. He testified that on the morning in question he "was

messed up on drugs and drinking alcoholic beverages." Although defendant, like Trull, admitted being at the scene of the crime, his testimony in all other respects was substantially different from the testimony given by Trull. Defendant testified that Trull asked the deceased for a ride home and that Trull directed the deceased to the scene of the crime; that Trull, after hitting the deceased, threw him out of his car and then got a bumper jack and beat and robbed him; that Trull asked defendant to help him carry the man's body into the bushes; and that he and Trull started the fire in the car using a match and a sleeve torn from defendant's shirt. Defendant further testified that "I never put my hands on him [the deceased] before the beating, and he never put his hands on me."

Defendant also called the State's expert in the field of typing and comparison of human blood, Mrs. Burton, as a defense witness. She testified that she had determined that the deceased's blood was type "A," that blood found under the fingernails of Trull was also type "A," but that blood found under the fingernails of defendant was type "B," and thus the blood found under defendant's fingernails was not that of the deceased. On cross-examination Mrs. Burton stated that at the time she took the fingernail scraping from defendant she saw "broken sores all over his face that evidently he had scratched."

Although the State admitted that at its request Mrs. Burton had taken a blood sample from defendant without a search warrant and had conducted a test to determine the blood type, at no time during the trial did either the State or the defense counsel elicit the results of the blood test. The record, therefore, is silent concerning defendant's blood type.

*Attorney General Robert Morgan and Assistant Attorney General Walter E. Ricks III, for the State.*

*George S. Daly, Jr., for defendant appellant.*

MOORE, Justice.

The sole assignment of error preserved by defendant and brought forward on appeal is whether hairs taken from defendant's head and arm were obtained in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

Defendant does not contend, and properly so, that the plucking and seizure of his hair was a violation of his Fifth

Amendment privilege against self-incrimination. In *Schmerber v. California,* 384 U.S. 757, 764, 16 L.Ed. 2d 908, 916, 86 S.Ct. 1826, 1832 (1966), a case involving the extraction of a blood sample, it was noted:

> " . . . [B]oth federal and state courts have usually held that [the privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

Defendant does contend, however, that his Fourth Amendment rights have been violated. The Fourth Amendment expressly provides that "[t]he right of the people to be secure in their *persons,* houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated. . . ." (Emphasis ours.) The obtaining of physical evidence from a person involves a potential Fourth Amendment violation at two distinct levels: (1) The seizure of the "person" necessary to bring him into contact with government agents, and (2) the subsequent search for and seizure of the evidence. See *United States v. Dionisio,* 410 U.S. 1, 8, 35 L.Ed. 2d 67, 76, 93 S.Ct. 764, 769 (1973); *Davis v. Mississippi,* 394 U.S. 721, 22 L.Ed. 2d 676, 89 S.Ct. 1394 (1969).

Unlike the defendant in *Davis v. Mississippi, supra,* defendant's rights in this case were not violated by an unlawful seizure of the person. In *Davis* the defendant and some twenty-three other persons were detained in police headquarters for fingerprinting without probable cause for arrest. The United States Supreme Court held that such detentions were constitutionally impermissible. In the present case the hairs were plucked from defendant's head and arm incident to a lawful arrest while defendant was in custody of the officers of the Charlotte Police Department charged with the first degree murder of Thomas Ross Garrison.

Testimony concerning the comparison between hair taken from under the fingernail of the deceased and that taken from defendant was presented by the State during its rebuttal to

counter defendant's defense that, although present at the scene of the crime, he did not touch the victim in an aggressive way likely to cause the victim to claw at defendant's arm. Such testimony would be competent unless the samples taken from defendant were obtained in violation of defendant's Fourth Amendment rights. *State v. Barber*, 278 N.C. 268, 179 S.E. 2d 404 (1971) ; *State v. Ray*, 274 N.C. 556, 164 S.E. 2d 457 (1968).

The question then arises: Was the plucking of the hairs, which were in plain view of the officers, and their seizure for microscopic examination, an unreasonable search and seizure within the meaning of the Fourth Amendment?

In *United States v. Dionisio, supra,* it is stated:

"In *Katz v. United States, supra* [389 U. S. 347, 19 L.Ed. 2d 576, 88 S.Ct. 507], we said that the Fourth Amendment provides no protection for what 'a person knowingly exposes to the public, even in his home or office. . . . ' 389 U.S. 347, at 351. The physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world. . . .

" . . . [A seizure of a voice exemplar] is like the fingerprinting in *Davis,* where, though the initial dragnet detentions were constitutionally impermissible, we noted that the fingerprinting itself, 'involves none of the probing into an individual's private life and thoughts that marks an interrogation or search.' *Davis v. Mississippi*, 394 U.S., at 727 [22 L.Ed. 2d 676, 89 S.Ct. 1394] ; cf. *Thom v. New York Stock Exchange*, 306 F. Supp. 1002, 1009." 410 U.S., at 14, 35 L.Ed. 2d, at 79-80, 93 S.Ct., at 771-72.

Hair, like fingerprints or a man's facial characteristics or the body itself, is an identifying physical characteristic and is constantly exposed to public view. Here defendant's hair was in plain view of all who saw him. Unquestionably the plucking of defendant's hairs by the police constituted a "seizure" that might *conceivably* be subject to the constraints of the Fourth

Amendment. The law does not, however, prohibit a seizure without a warrant by an officer in the discharge of his official duties when the article seized is in plain view. *Harris v. United States,* 390 U.S. 234, 19 L.Ed. 2d 1067, 88 S.Ct. 992 (1968) ; *Ker v. California,* 374 U.S. 23, 42-43, 10 L.Ed. 2d 726, 744, 83 S.Ct. 1623, 1635 (1963) ; *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495 (1968) ; *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25 (1967).

Moreover, although the United States Supreme Court in *Schmerber v. California, supra,* held that certain offical intrusions into an individual's person require a search warrant in order for the intrusions to be deemed reasonable and not violative of the Fourth Amendment, as stated in *United States v. D'Amico,* 408 F. 2d 331 (2d Cir. 1969) :

> ". . . This holding does not comprehend that all official intrusions into an individual's person require, in the absence of extenuating circumstances, a search warrant in order to be reasonable. Some official in-custody investigative techniques designed to uncover incriminating evidence from a person's body are such minor intrusions into or upon the 'integrity of an individual's person' (384 U.S. at 772, 86 S.Ct. 1826), that they are not, in the absence of a search warrant, unreasonable intrusions."

See also *United States v. Richardson,* 388 F. 2d 842 (6th Cir. 1968) ; *United States v. Caruso,* 358 F. 2d 184 (2d Cir. 1966) ; *United States v. Collins,* 349 F. 2d 863 (2d Cir. 1965). Thus it has been held that "the obtaining of hair samples after lawful arrest, where the means employed are reasonable, is not a violation of [one's] constitutional right." *Grimes v. United States,* 405 F. 2d 477 (5th Cir. 1968). See also *United States v. D'Amico, supra.*

There is nothing in the record to indicate that the hair samples taken from the defendant were taken in a forceful or unreasonable manner, or in such a way as to cause defendant to suffer any true humiliation or affront to his "integrity." Mrs. Mary Jane Burton, who was not an officer but a trained laboratory technician, testified that she asked defendant to pull his own hair and that he pulled the hair sample from his head and handed it to her in the presence of his lawyer. The record does not disclose how the arm hair sample was removed. Under these circumstances, it would have been a vain exercise to procure a search warrant to authorize an officer to search for something that was exposed to all who saw defendant.

In *Cupp v. Murphy*, 412 U.S. 291, 36 L.Ed. 2d 900, 93 S.Ct. 2000 (1973), the United States Supreme Court held that taking scrapings from under a defendant's fingernails went beyond a seizure of "physical characteristics . . . constantly exposed to the public," (citing *United States v. Dionisio, supra)* but held that the seizure of the scrapings without a warrant was proper since the blood and skin tracings found there could have easily been destroyed had the officer waited to obtain the warrant. Defendant here contends that the hair samples taken from him were not destructible evidence as in *Cupp*, and that the State had ample time and could easily have procured a search warrant. This may be true, but this is not the determining factor for procuring a search warrant. "The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances — the total atmosphere of the case." *United States v. Rabinowitz*, 339 U.S. 56, 66, 94 L.Ed. 653, 660, 70 S.Ct. 430, 435 (1950). " . . . Of course, the limits of reasonableness which are placed upon searches are equally applicable to seizures, *State v. Chinn*, 231 Ore. 259, 373 P. 2d 392, and whether a search or seizure is reasonable is to be determined on the facts of the individual case. *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed. 2d 730; *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed. 2d 777." *State v. Howard*, 274 N.C. 186, 202, 162 S.E. 2d 495, 506 (1968). Although no search was required in the present case, there was a seizure of the hair samples. Such seizure, however, was certainly reasonable. We fail to see how the taking of these few hairs from defendant while he was in custody could have been more prejudicial or offensive than the taking of his fingerprints or his photograph. *United States v. D'Amico, supra.*

We hold that the seizure of the hairs in the present case was not an unreasonable one or one violative of the Fourth Amendment and, therefore, that the testimony concerning the comparison of the hair found under the fingernail of the deceased and the hairs taken from the head and arm of defendant was properly admitted in evidence.

Defendant's own testimony is sufficient to sustain the verdicts, and our examination of the entire record reveals nothing that would justify disturbing the verdicts and the judgments in this case.

No error.