DECISION AND JUDGMENT ENTRY
The appellant, Johnie A. Coyle, was convicted of two counts of aggravated vehicular homicide with a driving under the influence specification resulting from an automobile accident that killed William Willoughby and Mark Lowe. The appellant raises four assignments of error for our review:
 I. First Assignment of Error: The Trial Court erred when it overruled appellant's motion to suppress from use at trial any and all D.N.A. evidence obtained as a result of the withdrawal of appellant's blood or the removal of his hair.
 II. Second Assignment of Error: The trial court erred when it instructed the jury to presume that the defendant was under the influence of alcohol based upon chemical tests admitted into evidence at trial, thereby denying the appellant due process of law.
 III. Third Assignment of Error: The trial court erred when it admitted into evidence appellant's blood test results.
 IV. Fourth Assignment of Error: The trial court erred when it allowed Lieutenant Kevin Teaford of the Ohio State Highway Patrol to give expert testimony regarding occupant kinetics.
Although we agree that the trial court erred in admitting the blood evidence complained of in the first assignment, we find the error harmless beyond a reasonable doubt. Finding none of the other assignments meritorious, we affirm.
 I.
One evening in March 1998, the appellant went to Mr. Willoughby's apartment in Chillicothe to drink beer and socialize with a group of friends. The appellant drank beer all evening before falling asleep at the apartment. The next morning, the appellant drank vodka with Mr. Willoughby before going to a local liquor store to purchase more alcohol. The appellant returned to Mr. Willoughby's apartment at about 10:30 a.m. with whiskey and a case of beer. The appellant and Mr. Willoughby drank for two more hours before deciding to go for a drive in Mr. Willoughby's car. At about 1:00 p.m., the appellant and Mr. Willoughby arrived at the home of Mr. Lowe, who was also a friend of the appellant's. The appellant convinced Mr. Lowe to go for a drive with them to nearby Ross Lake. Mr. Lowe's wife, Angela, saw the appellant driving the car as the men departed. The appellant remembers being at Ross Lake for a short time before deciding to leave when Mr. Lowe told them he needed to return home.
As the three men proceeded along Blacksmith Hill Road, Mr. Willoughby's car veered off the road, hit a tree, and landed upside down in a ditch. None of the men was wearing a seat belt. Mr. Willougby and Mr. Lowe died instantly from injuries suffered in the crash. Investigators later concluded that the car was traveling approximately 69 miles per hour when it left the roadway. Personnel from the Ross County Sheriff's Department and the Ohio State Highway Patrol arrived on the scene minutes later and found the appellant in the driver' s side area with his head against the dash and steering wheel. Mr. Willoughby's body was situated in the vehicle's front passenger area with his partially severed right arm hanging outside the passenger side window. Mr. Lowe's body was located in the rear of the passenger compartment. Paramedics removed the appellant through the driver's side door and transported him to a local hospital.
Ohio State Highway Patrol troopers Terri Mikesh and Patricia Nemeth went to the hospital later that afternoon to question the appellant about the accident. Both troopers noticed obvious signs of intoxication in the appellant, including a strong odor of alcohol, confusion about who was in the car, and a failure to remember if he was driving when the accident happened. While the last two symptoms were also consistent with a head injury, Trooper Mikesh placed the appellant under arrest for driving under the influence of alcohol and instructed a nurse to extract a vial of blood for alcohol testing. Under instructions from Trooper Nemeth, Trooper Mikesh also asked the nurse to extract two vials of blood for DNA testing and blood typing. Trooper Nemeth, who led the accident investigation, in this case, wanted to compare the appellant's blood with that found on the accident vehicle's windshield. Trooper Nemeth also took hair samples from the appellant's head to compare them with hair she found on the windshield. Neither trooper secured a warrant before taking the blood and hair samples. The test results revealed that these samples matched that of the blood and hair on the windshield. The results tended to confirm Trooper Nemeth's theory that the appellant was driving and hit his head on the windshield during the accident.
A grand jury indicted the appellant on two counts of aggravated vehicular homicide, in violation of R.C. 2903.06, for the deaths of Mr. Willoughby and Mr. Lowe. The indictment also contained a specification that the appellant was under the influence of alcohol at the time of the accident. The appellant pleaded not guilty and filed a motion to suppress results of the state's DNA and hair analysis.[1] He argued that the state violated his constitutional rights by seizing blood and hair for testing without either a warrant or exigent circumstances. The trial court denied the motion. Although it decided that the state should have obtained a warrant before extracting the appellant's blood and hair for testing, the court concluded that the state would have inevitably discovered the evidence absent the constitutional violation. A jury ultimately found the appellant guilty on both counts of aggravated vehicular homicide. The jury also found that the appellant was under the influence of alcohol at the time of the accident. The alcohol specification carried a mandatory prison term and a permanent driver's license revocation. R.C. 2903.06 (C). After the court sentenced him to consecutive five-year prison terms, the appellant commenced this appeal.
 II.
In his first assignment of error, the appellant argues that the trial court should have suppressed all DNA evidence obtained by the state through the collection of his blood and hair. When reviewing a trial court's decision on a motion to suppress evidence, we are presented with a mixed question of law and fact.State v. Long (1998), 127 Ohio App.3d 328, 332. In a hearing on a motion to suppress, the trial court acts as the trier of fact and is in the best position to resolve factual questions and evaluate the credibility of witnesses. State v. Brooks (1996), 75 Ohio St.3d 148,154; State v. Mills (1992), 62 Ohio St.3d 357, 366. We therefore defer to the trial court's findings of fact so long as they are supported by competent, credible evidence. State v.Medcalf (1996), 111 Ohio App.3d 142, 145; State v. Guysinger
(1993), 86 Ohio App.3d 592, 594. We must then determine, utilizing a de novo standard of review, whether the trial court correctly applied the appropriate legal standard to the facts of the case. Ornelas v. United States (1996), 517 U.S. 690, 699,116 S.Ct. 1657, 134 L.Ed.2d 911; Long, 127 Ohio App.3d at 332.
While at the hospital, three vials of blood and a hair sample were taken from the appellant. He challenges both warrantless extractions, arguing that they violated his constitutional right to be free from unreasonable searches and seizures. SeeFourth Amendment, United States Constitution; Section 14, Article I, Ohio Constitution. The trial court ruled that the troopers needed a warrant before extracting both the blood for DNA testing and the hair for laboratory testing.[2] Despite the warrantless extractions, however, the court did not suppress the evidence. Invoking the inevitable discovery doctrine, the court concluded that probable cause already existed for the extractions at the time Troopers Mikesh and Nemeth took the samples and that the officers therefore could have secured a warrant had they tried. Because the seizure of the appellant's hair differs analytically from the taking of his blood, we analyze them separately.
 A.
Before we decide whether the court correctly applied the inevitable discovery exception in admitting the appellant's hair samples, we must first determine whether taking his hair constituted a "search" or "seizure" subject to state and federal constitutional constraints. In this case, the trial court decided that Trooper Nemeth's pulling of hair samples constituted a "search" requiring either a warrant or exigent circumstances. Although we agree that the removal of hair was a "search and seizure," we disagree that Trooper Nemeth needed a warrant or exigent circumstances to justify her actions.[3]
Neither party cites an Ohio case that expressly decides whether the involuntary removal of hair samples from a suspect's head constitutes a "search" or "seizure" subject to constitutional strictures. Indeed, it appears that the case law in Ohio has not resolved this question. Compare State v. Masterson (December 26, 1974), Mahoning App. No. 74CA19, unreported (noting that removal of a few strands of hair was not considered a "search"), withState v. Szalai (1983), 13 Ohio Misc.2d 6, 7 (noting in dicta that taking of handwriting exemplars, hair samples, blood, or other bodily substances amounts to a search and seizure). The lack of clarity on this issue is not surprising. Even the federal courts are not consistent in deciding whether the involuntary removal of hair samples constitutes a search and seizure under the Fourth Amendment. United States v. DeParias (C.A.11, 1986),805 F.2d 1447, 1456, overruled on other grounds by United Statesv. Kaplan (C.A.11, 1999), 171 F.3d 1351; see, also, United Statesv. Bullock (C.A.5, 1995) 71 F.3d 171, 176, fn.3. Some courts have likened the removal of hair samples to the compulsion of voice or handwriting exemplars, which have been held outside the ambit ofFourth Amendment protection. See, e.g., In re Grand JuryProceedings (Mills) (C.A.3, 1982), 686 F.2d 135, 139.[4] Other courts have recognized that the taking of hair samples constitutes a search and seizure that is potentially subject toFourth Amendment constraints. See, e.g., United States v. D'Amico
(C.A.2, 1969), 408 F.2d 331, 332; State v. Sharpe (1973),284 N.C. 157, 200 S.E.2d 44, 48. We adopt the view that the involuntary removal of hair samples from a suspect's head is a search and seizure. By taking a hair sample, Trooper Nemeth physically removed a tangible item from the appellant's body. Cf.Cupp v. Murphy (1972), 412 U.S. 291, 93 S.Ct. 2000,36 L.Ed.2d 900 (taking samples from underneath fingernails was a search); see, also, California v. Hodari D. (1991), 499 U.S. 621, 624,111 S.Ct. 1547, 1549-50, 113 L.Ed.2d 690 (defining "seizure" as "taking possession" of some object so as to bring it "within physical control") Having found that Trooper Nemeth's action is a "search and seizure," the question then becomes whether it was constitutionally permitted.
Even jurisdictions recognizing the removal of hair as a "seizure" have not required a warrant or exigent circumstances as a prerequisite to taking the samples from a suspect who is under arrest. The D'Amico court recognized that "[s]ome official in-custody investigative techniques designed to uncover incriminating evidence from a person's body are such minor intrusions into or upon the "integrity of an individual's person' * * * that they are not, in the absence of a search warrant, unreasonable intrusions." Id. at 333. Using this rationale,D'Amico held that the "clipping" of a criminal suspect's hair while the suspect was in custody was so minimal an intrusion that it was necessarily reasonable under the Fourth Amendment. Id.
Many courts have followed the D'Amico rationale and upheld seizure of hair from a defendant's head for the purpose of comparing it with hair found at a crime scene. See, e.g.,United States v. Weir (C.A.8, 1981), 657 F.2d 1005, 1007; Commonwealthv. Cross (1985), 508 Pa. 322, 496 A.2d 1144, 1150; State v.McCumber (Utah 1980), 622 P.2d 353, 358; State v. Sharpe, supra,200 S.E.2d at 48-49; People v. Rankins (1978), 81 Mich. App. 694,265 N.W.2d 792, 793. We adopt this position and hold that Trooper Nemeth's pulling of hair samples in this case did not violate theFourth Amendment. We find nothing unreasonably intrusive about Trooper Nemeth's actions. Absent any indication in the record that Trooper Nemeth took the hair samples in an abusive or unreasonable manner, we cannot conclude that the appellant suffered any true humiliation or affront to his dignity. SeeSharpe, 200 S.E.2d at 48; but, cf., Bouse v. Bussey (C.A.9, 1977), 573 F.2d 548, 550 (forcible removal of pubic hair was unreasonably intrusive and a violation of Fourth Amendment). Certain minimally intrusive investigative techniques (e.g.,
fingerprinting) involving an in-custody criminal suspect are lawful not because they do not constitute a search, but, rather, because they are reasonable when performed incident to a lawful arrest. See 1 LaFave, Search and Seizure (3 Ed. 1996) 568, Section 2.6 (a.). In other words, a legal arrest takes certain minimal aspects of privacy "out of the realm of protection from police interest in weapons, means of escape and evidence * * *."Id., citing United States v. Edwards (1974), 415 U.S. 800,94 S.Ct. 1234, 39 L.Ed.2d 771. Thus, we uphold the trial court's refusal to suppress the hair sample, albeit for different reasons. Because Trooper Nemeth's minor intrusion was reasonable under the Fourth Amendment, we have no reason to examine whether the trial court properly applied the inevitable discovery doctrine in refusing to suppress the hair samples.
 B.
We next turn our attention to the warrantless seizure of the appellant's blood for DNA analysis. It is well-settled that the extraction of blood is a bodily intrusion that qualifies as a "seizure" subject to the constitutional requirement of reasonableness. Schmerber v. California (1966), 384 U.S. 757,767-68, 86 S.Ct. 1826, 16 L.Ed.2d 908. Interests in "human dignity and privacy" forbid such intrusions beyond the body's surface "on the mere chance that desired evidence might be obtained." Id. at 770. Accordingly, police may extract blood from a person only upon issuance of a warrant or when there is probable cause coupled with exigent circumstances demanding immediate extraction. See State v. Pearson (1996), 114 Ohio App.3d 153,157.
Trooper Mikesh took the first vial of blood pursuant to R.C.4511.191, Ohio's implied consent statute, incident to her arrest of the appellant for suspicion of drunk driving. She took the remaining two vials of blood for DNA testing and blood typing. The appellant does not challenge extraction of his blood for alcohol testing; extraction for this purpose incident to a lawful arrest for driving under the influence of alcohol does not violate the constitutional right to be free from unreasonable searches and seizures. State v. Starnes (1971), 21 Ohio St.2d 38, paragraph one of the syllabus; see, generally, Schmerber, supra.
The appellant challenges only the extraction of the additional two vials of blood for DNA testing. Because there were no exigent circumstances, the appellant argues that Trooper Mikesh needed to secure a warrant before obtaining blood for this purpose. SeeState v. Carter (1988), 322 N.C. 709, 370 S.E.2d 553, 556 (no exigent circumstances when seizing blood to test for defendant's blood type because blood type would remain constant).[5]
Although the trial court agreed, it applied the inevitable discovery doctrine to deny the appellant's motion to suppress. The court reasoned that "* * * probable cause did exist and that the officers could have obtained a warrant from the court for the extraction of blood for the purpose of DNA testing and blood typing * * *." Thus, the court decided that the state could have obtained the identical DNA test results absent the illegal seizure of the appellant's blood.
The inevitable discovery doctrine permits the introduction of evidence derived from a violation of a defendant's constitutional rights if the state can prove, by a preponderance of the evidence, that authorities would have ultimately discovered the evidence by lawful means. Nix v. Williams (1984), 467 U.S. 431,444, 104 S.Ct. 2501, 81 L.Ed.2d 377; State v. Perkins (1985),18 Ohio St.3d 193, syllabus. The doctrine applies as an exception to the exclusionary rule, which ordinarily precludes the introduction of evidence that was either illegally obtained or an indirect product of unlawful police conduct. Id. at 194; see, generally, Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684,6 L.Ed.2d 1081 (applying exclusionary rule to state criminal prosecutions) The rationale behind the inevitable discovery doctrine is derived largely from the policy behind the exclusionary rule. The overriding reason for the exclusionary rule is to deter police from violating constitutional protections by excluding evidence seized as a result of such violations, notwithstanding the high social cost of depriving juries of relevant evidence suggesting a defendant's guilt. Williams,467 U.S. at 443; Perkins, 18 Ohio St.3d at 194-95. If the police would have inevitably found evidence lawfully, this "deterrence rationale" has diminished importance. See Williams,467 U.S. at 444. Just as the exclusionary rule seeks to put the state in the same position it would have been absent the unlawfully-seized evidence, the inevitable discovery exception prevents the state from being put in a worse position by refusing evidence that would have been lawfully discovered absent unlawful conduct by police. Id.; Perkins, 18 Ohio St.3d at 196.
The inevitable discovery doctrine makes pragmatic sense in its intent to "ensure that suppression does not outrun the [exclusionary rule's] deterrence objective * * *." 5 LaFave,supra, at 244, Section 11.4 (a). Notwithstanding the doctrine's logical premise, we should not apply it in such a way as to encourage unconstitutional shortcuts by police. Id. Thus, the circumstances justifying application of the doctrine are most likely present when there are already investigative procedures in place prior to the unlawful seizure, of evidence. State v.Pearson, supra, 114 Ohio App.3d at 162. The state argues that investigative procedures, which would have ultimately led to a warrant, were underway apart from Trooper Mikesh's warrantless blood extraction. The record does not support this contention. Moreover, we are unpersuaded by the state's argument that the inevitable discovery doctrine should apply just because officerscould have obtained a warrant had they sought one.
The state's purported justification threatens coreFourth Amendment values by sanctioning an unconstitutional shortcut,i.e. bodily intrusion without a warrant or exigent circumstances. To apply the inevitable discovery doctrine whenever police could
have obtained a warrant, yet chose not to, would essentially eliminate the warrant requirement and encourage police to proceed without a neutral and detached magistrate's probable cause determination. Pearson at 163, quoting State v. Masten (September 29, 1989), Hancock App. No. 5-88-7, unreported; State v. Pearson
(1996), 114 Ohio App.3d 168, 180. See, also, United States v.Mejia (C.A.9, 1995), 69 F.3d 309, 320; State v. Griffin (C.A.6, 1974), 502 F.2d 959, 961; State v. Handtmann (N.D. 1989),437 N.W.2d 830, 838.[6] We are unwilling to apply the inevitable discovery doctrine in a manner that would uphold a warrantless and non-exigent search whenever a court makes a post hoc
determination that probable cause existed. Accord United Statesv. Johnson (C.A.6, 1994), 22 F.3d 674, 683; State v. Sugar
(1985), 100 N.J. 214, 495 A.2d 90, 104, fn. 3; People v. Knapp
(1981), 52 N.Y.2d 689, 439 N.Y.S.2d 871, 422 N.E.2d 531, 536;Commonwealth v. Benoit (1981), 382 Mass. 210, 415 N.E.2d 818,823; Smith v. State (1987), 72 Md. App. 450, 531 A.2d 302; see, also, State v. Ault (1986), 150 Ariz. 459, 724 P.2d 545, 551-52
(decided on state constitutional grounds). Accordingly, the trial court erred in applying the inevitable discovery doctrine based on a theory that law enforcement officials could have obtained a warrant to extract the appellant's blood if they had sought one.[7]
Even if the trial court erred in admitting the unlawfully seized DNA evidence, the state argues that this error was harmless and therefore does not warrant reversal of the appellant's conviction. The only significance of the DNA evidence to the state's case was to establish that the appellant was driving the car at the time of the accident. The state argues that there was overwhelming evidence apart from the DNA results that enabled the jury to conclude beyond a reasonable doubt that the appellant was driving at the time of the accident. Conversely, the appellant contends that the erroneous admission of DNA evidence was prejudicial due to the state's emphasis upon it. He argues that the state devoted "a large portion" of its closing argument to the DNA evidence presented by its expert. Because the state had no direct evidence (i.e. an eyewitness) establishing that the appellant was actually driving when the accident occurred, the appellant argues that the improper admission of the DNA evidence warrants reversal.
Before an error of constitutional dimension may be deemed nonprejudicial, a reviewing court must conclude that the error was harmless beyond a reasonable doubt. Chapman v. California
(1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; State v.Williams (1983), 6 Ohio St.3d 281, paragraph three of the syllabus. The admission of evidence in violation of a defendant's constitutional rights is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of a defendant's guilt. Id. at paragraph six of the syllabus. If, however, there is a reasonable probability that the evidence complained of might have contributed to the conviction, the error is not harmless beyond a reasonable doubt. State v.Madrigal (2000), 87 Ohio St.3d 378, 388. Applying this standard, we agree with the state that the erroneous admission of the DNA evidence was harmless.
A multitude of compelling circumstantial evidence apart from the DNA testing pointed to the appellant as the driver of the car at the time of the accident. Photographs depicting the accident wreckage showed Mr. Willoughby situated in the front passenger area of the vehicle. One grisly photograph showed Mr. Willoughby's partially severed arm hanging out of the passenger window of the car. Another photograph showed the appellant's leg protruding out of the driver's side window. Further, several witnesses from the highway patrol and the sheriff's department testified that they saw Mr. Willoughby in the front passenger area of the vehicle and the appellant in the dash and steering wheel area. Additionally, Angela Lowe testified that she saw the appellant driving the car when the three men left her home about a half-hour before the crash. Although the appellant testified that the three men stopped at Ross Lake in between the time they left the Lowe residence and the time of the accident, the jury could have believed Ms. Lowe's testimony and reasonably inferred that the appellant was driving the entire time.
We also disagree with the appellant's assertion that the state devoted a "large portion" of its closing argument to an emphasis on the DNA evidence. While the state urged the jury to consider the evidence from the "expert examiners" concerning the blood on the windshield, the state's closing argument did not place primary emphasis on the DNA evidence. The prosecution placed at least equal emphasis on the remaining circumstantial evidence that the appellant was driving.
Given the volume of evidence pointing to the appellant as the vehicle's driver at the time of the accident, we conclude that the erroneous admission of the DNA evidence was harmless beyond a reasonable doubt. We therefore overrule the first assignment of error.
 III.
Next, we address the appellant's fourth assignment of error, as it also deals with the introduction of evidence probative of the appellant's identity as the driver. In this assignment, the appellant challenges the admission of expert testimony from OSHP lieutenant Kevin Teaford, an accident reconstructionist presented by the state. Lt. Teaford testified about the vehicle's speed, as well as the probable positions of the occupants at the time of the crash. Lt. Teaford opined that the appellant was the driver of the car, which was traveling approximately 69 m.p.h. at the time it left the roadway. The appellant does not challenge Lt. Teaford's reconstruction of the crash and his opinion concerning the car's speed. The appellant challenges the admissibility of Lt. Teaford's opinion regarding "occupant kinematics," i.e. the movement of occupants-in the vehicle, and Lt. Teaford's conclusion that the appellant was the driver. The appellant contends that Lt. Teaford was not qualified to issue an opinion based upon occupant kinematics. He also argues that Lt. Teaford did not establish that the methodology he employed was reliable.
Evid.R. 702 governs the admissibility of expert testimony. The rule states:
 A witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge of lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
When an expert witness offers scientific, technical, or other specialized knowledge, the trial court is vested with an important "gatekeeping" function in deciding whether to admit expert testimony. See Kumho Tire Co. v. Carmichael (1999),526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238. When performing this function, the trial court possesses considerable discretion in deciding the competency of an expert and the admissibility of expert testimony. See Nichols v. Hanzel (1996), 110 Ohio App.3d 591,597 (regarding competency); Colboch v. Uniroyal Tire Co.,Inc. (1996), 108 Ohio App.3d 448, 461 (admissibility). Thus, a reviewing court reviews the admission of expert testimony under an abuse of discretion standard. State v. Awkal (1996), 76 Ohio St.3d 324,331. An abuse of discretion connotes an unreasonable, arbitrary, or unconscionable attitude by the trial court.Nichols, 110 Ohio App.3d at 597, citing Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. We are also mindful that the trial court's discretion is guided by the requirements of Evid.R. 702, which must be satisfied before an expert's testimony is admissible. State v. Bragg (June 11, 1999), Ross App. No. 98CA2444, unreported, citing Gianelli Snyder, Rules of Evidence Handbook (1999) 229, Evid.R. 702 Commentary. Accordingly, a trial court abuses its discretion when it admits testimony that does not comply with the Evid.R. 702 requirements.
The appellant first challenges the trial court's decision that Lt. Teaford was qualified to give expert testimony on the issue of occupant kinematics. To qualify as an expert, the witness need not be the "best witness" on the particular subject in question.State v. Yates (1994), 71 Ohio St.3d 219, 221. The witness will qualify as an expert if he demonstrates some special knowledge on the particular subject acquired either by study of recognized authorities or by practical experience. State Auto Mut. Ins. Co.v. Chrysler Corp. (1973), 36 Ohio St.2d 151, 160; Nichols, supra,110 Ohio App.3d at 597. An expert qualified in one subject, however, may not be qualified to testify on another related subject. Campbell v. The Daimler Group, Inc. (1996), 115 Ohio App.3d 783,793. For example, a witness qualified to testify regarding accident investigation is not qualified to give an opinion on the cause of an accident without first being qualified as an accident reconstruction expert. Yates,71 Ohio St.3d at 221.
In this case, the trial court differentiated occupant kinematics from other aspects of accident reconstruction. After Lt. Teaford had already recited his qualifications and training in general accident reconstruction, the court specifically asked the prosecutor to elicit additional testimony regarding the witness' qualifications relating to occupant kinematics. After hearing Lt. Teaford's explanation of his training and experience in the specific area of occupant kinematics, the court allowed Lt. Teaford to opine that the appellant was the driver of the car at the time of the crash. The appellant argues that the trial court abused its discretion, emphasizing that Lt. Teaford's formal training in occupant kinematics consisted of only four to six hours of classroom instruction and completion of two seminar projects. Lt. Teaford also admitted that he had never testified as an accident reconstruction expert when the driver's identity was at issue.
We find no abuse of discretion by the trial court in deciding that Lt. Teaford was qualified to testify on occupant kinematics. Lt. Teaford testified that he had been involved in fifty to one hundred cases as either an investigator or reconstructionist when driver identity was at issue. Thus, Lt. Teaford had practical experience in the specific area of occupant kinematics even though he had not previously testified as an expert in the field. Further, Lt. Teaford had studied recognized authorities on occupant kinematics, including a number of research articles and two accident reconstruction manuals. Lt. Teaford noted that one of the manuals on-which he relies is used as a textbook at accident reconstruction seminars attended by law enforcement personnel. In light of Lt. Teaford's experience and training in accident reconstruction issues involving occupant kinematics, we find nothing arbitrary, unreasonable, or unconscionable in finding Lt. Teaford qualified.
The appellant also takes issue with the admissibility of Lt. Teaford's actual testimony concerning occupant kinematics and his conclusion that the appellant was driving. The appellant argues that Lt. Teaford did not establish a reliable scientific, technical, or otherwise specialized basis for his testimony, as required by Evid.R. 702 (C). Our review of the record, however, indicates that the issue concerning the reliability of Lt. Teaford's methodology is not properly before us. The only objections by trial counsel relate to the issue of Lt. Teaford's competency. After a series of objections and specific voir dire
examinations concerning Lt. Teaford's expertise in occupant kinematics, the trial court found him qualified. While trial counsel renewed his objection to competency following Lt. Teaford's opinion, he never expressly objected to the methodology, used, even though he criticized it during cross-examination as being simplistic. Evid.R. 103 (A) requires that an objection state with specificity the grounds upon which it is based.[8] The failure to object with specificity results in waiver of the purported error. Evid.R. 103 (A) (1); see, also,State v. Sibert (1994), 98 Ohio App.3d 412, 422.
Assuming that the admission of Lt. Teaford's testimony was erroneous, we nonetheless conclude that it was harmless beyond a reasonable doubt. Like the DNA evidence we discussed in the first assignment of error, Lt. Teaford's testimony was not necessary to conclude that the appellant was driving. The accident photographs and the investigating officers' testimony offered compelling circumstantial evidence that the appellant was driving. The appellant's admission that he "might have been" driving coupled with Angela Lowe's testimony that she saw the appellant driving about a half-hour before the accident also provided ample basis for the jury to conclude that the appellant was the driver. Simply, the state did not need Lt. Teaford's expert testimony to prove its case. Because the alleged error is harmless beyond a reasonable doubt, we need not indulge in the plain error analysis that normally complements the application of waiver under Evid.R. 103 (A). The fourth assignment of error is overruled.
 IV.
The second and third assignments of error raise related issues, which we will analyze together. In his second assignment of error, the appellant challenges an instruction allowing the jury to presume his intoxication at the time of the accident based upon results of a blood-alcohol test. In the third assignment, the appellant alleges that the trial court erred in admitting the blood-alcohol test results at all. We find that neither assignment has merit.
To be guilty of aggravated vehicular homicide under R.C.2903.06, a defendant must have recklessly caused the death of another while operating a motor vehicle. R.C. 2903.06 (A). The statute further provides for special penalty provisions if an offender was under the influence of alcohol at the time of the offense:
 If the jury or judge as trier of fact finds that the offender was under the influence of alcohol * * * at the time of commission of the offense, then the offender's driver's * * * license * * * shall be permanently revoked pursuant to section 4507.16 of the Revised Code.
 When the trier of fact determines whether an offender was under the influence of alcohol * * *, the concentration of alcohol in the offender's blood * * * as shown by a chemical test taken pursuant to section 1547.111 or 4511.191 of the Revised Code may be considered as competent evidence, and the offender shall be presumed to have been under the influence of alcohol if there was at the time the bodily substance was withdrawn for the chemical test a concentration of ten-hundredths of one percent or more by weight of alcohol in the offender's blood
R.C. 2903.06 (B)
Thus, a chemical test taken pursuant to R.C. 4511.191 may trigger a statutory presumption that a defendant was under the influence of alcohol. In this case, a blood test showed that the appellant had a blood alcohol content of .225 grams per one hundred milliliters of blood. Based upon this evidence, the trial court instructed the jury regarding the evidential presumption they could apply in this case:
 The law provides that there is a presumption to be applied of a chemical test * * * such as a blood test that has been introduced and certain conditions exist. * * * The presumption which may be applicable to this case is that the defendant was under the influence of alcohol. Before you can apply this presumption, the "state must prove beyond a reasonable doubt that a blood sample was taken from the defendant and the test results obtained were ten one hundredths of one percent or more by weight of alcohol in his blood. Should you find beyond reasonable doubt the defendant's test results are equal to or greater than ten one hundredths of one percent or more by weight of alcohol in his blood, then you may regard the test as sufficient proof [that] the defendant was under the influence of alcohol unless it is met by evidence of equal or greater weight from which you can conclude either the defendant was not under the influence of alcohol or that a reasonable doubt exists * * * on this issue. In that event, you will disregard the presumption and decide from all the facts and circumstances in evidence whether the state has proven beyond a reasonable doubt that the defendant was under the influence of alcohol.
Notwithstanding the evidence of his blood test, the appellant argues that the trial court should not have given this instruction. Because his blood sample was extracted more than two hours after the accident, the appellant argues that the presumption was inapplicable and that the trial court erroneously opened the door for the jury to presume he was under the influence of alcohol at the time of the accident.
The failure to extract a blood sample within two hours of the alleged offense does not render the subsequent blood test results inadmissible in a vehicular homicide case. State v. Stinson
(1984), 21 Ohio App.3d 14, 15; State v. Hernandez (1979), 62 Ohio App.2d 63,66-68; State v. Cooper (August 29, 1997), Lucas App. No. L-96-280, unreported. A number of courts have held, however, that the failure of the test to comply with R.C. 4511.19's two-hour requirement precludes the test from being used to raise a presumption that a defendant was under the influence of alcohol at the time of the offense. State v. Caudill (1983), 11 Ohio App.3d 252,255; State v. Kabeller (December 20, 1990), Franklin App. No. 90AP-53, unreported; cf. Newark v. Lucas (1988), 40 Ohio St.3d 100, paragraph one of the syllabus (providing that results of blood test may be admitted in DUI prosecution based upon prohibited alcohol concentration only when bodily substance is withdrawn within two hours of alleged violation). Were these cases the end of our inquiry, the appellant's argument would prevail. We believe, however, that the presumption instruction was proper because the appellant waived any argument concerning the blood test's failure to satisfy the two-hour requirement.
In State v. French (1995), 72 Ohio St.3d 446, the Ohio Supreme Court addressed whether a defendant in a DUI prosecution could challenge the admissibility at trial of a chemical test when he had failed to file a pretrial motion to suppress the results. The court held:
 Because Crim.R. 12 (B)(3) applies to all charges under R.C. 4511.19, a defendant charged under R.C. 4511.19 (A)(1) through (4) who does not challenge the admissibility of the chemical test results through a pretrial motion to suppress waives the requirement on the state to lay a foundation for the admissibility of the test results at trial. The chemical test is admissible at trial without the state demonstrating that the bodily substance was withdrawn within two hours of the time of the alleged violation * * *."
Id. at paragraph one of the syllabus (emphasis added). Prior toFrench, the court had recognized that a motion to suppress was the proper procedural mechanism for challenging the admissibility of chemical tests in DUI prosecutions based upon the defendant driving with a prohibited alcohol concentration in his blood, breath, or urine. See Defiance v. Kretz (1991), 60 Ohio St.3d 1, syllabus. The rationale for this rule was that the admissibility of chemical test results depended upon the resolution of issues "capable of determination without a trial on the general merits,"i.e. the test being conducted in substantial compliance with statutory and regulatory guidelines. French at 450-51; see, also,State v. Ulis (1992), 65 Ohio St.3d 83, 85. However, pursuant to Crim.R. 12 (B) (3), a defendant waives his challenge to the state's compliance with statutes and regulations governing alcohol testing if he fails to file a motion to suppress the test results. French at 451 (explaining implication of prior holdings in Kretz and Ulis). In French, the Supreme Court extended the waiver concept to DUI prosecutions under R.C. 4511.19 (A) (1), which proscribes driving while under the influence of alcohol regardless of an offender's alcohol concentration. The court reasoned that the policy of "early determination" of the admissibility issue applied just as much in DUI prosecutions based upon impaired driving as it did in DUI prosecutions based upon a prohibited alcohol concentration. Although chemical test results "are merely an additional factor to be considered along with all other evidence of impaired driving * * *, the procedures used to obtain the test results are the same, as are the requirements of admissibility." Id. Because the procedures are the same, "[t]he policy of early determination applies equally, as does the mandatory language of Crim.R. 12 (B) (3)." Id.
Accordingly, a defendant charged with any DUI offense waives the requirement on the state to lay a foundation for the admissibility of the test results at trial, including the requirement that the state demonstrate that the bodily substance was withdrawn within two hours of the alleged offense. Id.
We believe that the French rationale applies with equal force to vehicular homicide prosecutions seeking to prove that a defendant was under the influence of alcohol. The relevance of an alcohol test is the same in a vehicular homicide case as it is in a prosecution for OUT. In either case, the state is using the test as a means to help establish that the driver was under the influence of alcohol at the time of the alleged offense. Further, the vehicular homicide statute expressly refers to a chemical test "taken pursuant to section * * * 4511.191 of the Revised Code * * *." R.C. 2903.06 (B). A test taken pursuant to R.C.4511.191, which provides for a driver's implied consent to chemical tests, is subject to various restrictions on testing methods set forth in R.C. 4511.19 (D) (1). State v. Overstreet
(June 22, 1989), Cuyahoga App. No. 55328, unreported. Thus, the vehicular homicide statute contemplates alcohol testing using the same procedures and the same admissibility standards as those in DUI cases. See id. Given the identity of the testing requirements and the reasons for utilizing the test, the rule enunciated inFrench logically extends to vehicular homicide cases involving an alcohol specification. When the state uses an alcohol test to prosecute either DUI or vehicular homicide, the issue whether the test failed to comply with regulatory or statutory standards is capable of "early determination" in a motion to suppress. Accordingly, a defendant waives any argument that the two-hour requirement was not satisfied when he fails to file a motion to suppress test results pursuant to Crim.R. 12(B)(3). See State v.Geneva (June 19, 1996), Tuscarawas App. No. 95AP030011, unreported (applying French in aggravated vehicular homicide case to hold that defendant waived challenge to blood-alcohol test by failing to file motion to suppress).
In this case, the appellant's only argument that the presumption instruction was improper focuses on the state's failure to establish that his blood sample was drawn within two hours. The appellant did not, however, file a motion to suppress the results of his blood-alcohol test. Although he filed a Crim.R. 12 (B) (3) motion to suppress, the appellant limited his motion to the results of the DNA testing and the analysis of his hair samples. The appellant therefore waived any requirement that the state lay a foundation for admitting the test results. SeeGeneva, supra. The test was therefore admissible without a demonstration that the appellant's blood sample was drawn within two hours of the accident. Once the test was admissible, the state was entitled to the presumption instruction given by the trial court. Thus, the appellant's waiver of the state's foundational requirements rendered the presumption instruction proper absent any other basis for excluding the test results as evidence. The second assignment of error is therefore overruled.[9]
Through his third' assignment of error, the appellant challenges the admissibility of his blood-alcohol test results. He contends that there was no testimony explaining how the result, a .225 blood-alcohol content, correlates with a finding that the appellant was under the influence of alcohol. Without expert testimony on this correlation, the appellant contends that the test result was irrelevant and should not have been admitted. We disagree because the appellant's waiver concerning the state's responsibility to establish compliance with the blood-alcohol testing standards obviated the need for this type of testimony.
Even when an appellant waives the state's responsibility to establish compliance with statutory and regulatory alcohol testing standards, a defendant may still challenge the chemical test results at trial under the Rules of Evidence. French,72 Ohio St.3d at 452. This is precisely what the appellant is doing on this appeal, by arguing that the test results were not relevant without any explanation of their meaning. The appellant's waiver of the state's foundational requirements, however, has the ripple effect of foreclosing this argument. When the appellant waived his challenge to the test results on foundational grounds, the blood-alcohol test results became admissible and entitled the state to the presumption of intoxication authorized by R.C. 2903.06 (B). Because the numerical result of the appellant's blood-alcohol test triggered the presumption, it was no longer necessary for the state to present expert testimony explaining the correlation between the blood-alcohol test results and the appellant's intoxication. The state had the option of relying simply upon the presumption, without introducing the type of expert testimony insisted upon by the appellant. Although French leaves open the possibility that a defendant could challenge the admissibility of chemical test results despite waiver of the state's requirement to lay an appropriate foundation for them, the type of challenge the appellant raises here is without merit.[10]
Further, even if the trial court had erred in admitting the blood-alcohol test results, we would find no error warranting reversal of the appellant's conviction for aggravated vehicular homicide. We realize that evidence of intoxication is relevant toward establishing that a defendant acted recklessly. State v.Runnels (1989), 56 Ohio App.3d 120, 126. There was ample evidence apart from the blood-alcohol test result that supported a finding of recklessness. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result." R.C. 2901.22 (C). The appellant's decision to drive after a binge-like consumption of alcohol for several hours leading up to the accident suggested a perverse disregard for the risk of driving drunk. Further evidence of recklessness lies with how fast the appellant was driving at the time of the accident, on a curvy two-lane road; Lt. Teaford and Trooper Nemeth estimated that the appellant was driving 69 m.p.h. at the time he went off the road. Further, we note that the prosecutor did not stress the blood-alcohol test results to support a finding of recklessness; rather, the prosecutor focused on the appellant's mere consumption of alcohol as probative of his recklessness. We find the evidence of the appellant's mens rea to be overwhelming. The third assignment of error is overruled.
Having overruled each of the appellant's assignments of error, we affirm the appellant's conviction for aggravated vehicular homicide.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in "that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J. Evans, J.: Concur in Judgment and Opinion.
For the Court
 BY: ________________________ William H. Harsha, Judge
 NOTICE TO COUNSEL Pursuant to Local Rule No. 14, this document constitutes a finaljudgment entry and the time period for further appeal commencesfrom the date of filing with the clerk.
[1] The appellant did not seek to suppress the results of the test for his blood-alcohol level.
[2] At the suppression hearing, the court rejected the state's argument that the appellant consented to the extractions of blood and hair. The state did not appeal that determination and we therefore decline to revisit that aspect of the court's ruling on the motion to suppress.
[3] In his appellate brief, the appellant argues that Trooper Nemeth pulled hair samples from his head for DNA analysis. The record does not, however, support this claim. Trial testimony from various witnesses indicated that the state's criminalists performed DNA analysis only on the appellant's blood. Analysis of the appellant's hair, however, was limited to a microscopic comparison with hair found on the accident vehicle's windshield. Trooper Nemeth also testified that she took hair samples for the purpose of comparing it with the hair on the windshield and not for DNA analysis. Accordingly, our analysis of the seizure and testing of the appellant's hair is limited to the purposes for which the hair samples were used.
[4] The United States Supreme Court held that voice and handwriting exemplars were outside the ambit of Fourth Amendment protection in United States v. Dionisio (1973), 410 U.S. 1,14-15, 93 S.Ct. 764, 771-72, 35 L.Ed.2d 67 (voice exemplar), and United States v. Mara (1973), 410 U.S. 19, 21-22, 93 S.Ct. 774,776, 35 L.Ed.2d 99 (handwriting exemplar).
[5] The appellant does not argue the absence of probable cause for taking his blood samples. He argues only that the troopers should have obtained a warrant due to the lack of exigent circumstances.
[6] But, see, State v. Pearson (1997), 119 Ohio App.3d 745,755-56 (Sixth District case rejecting rationale of Pearson cases from the Third District, and finding inevitable discovery applicable when police had enough evidence to obtain a warrant for blood sample). We note that the trio of Pearson cases from the Third and Sixth Districts involved the same defendant, who was convicted of raping three different victims.
[7] At least one Ohio appellate decision has indicated that the inevitable discovery doctrine could apply if police "were attempting to get a warrant independent of [a warrantless] search * * *." State v. Miller (1991), 77 Ohio App.3d 305, 316. This view has some support from other jurisdictions. See, * * *." State v. Johnson (1990), 120 N.J. 263, 576 A.2d 834, 848
(applying inevitable discovery doctrine to warrantless seizure of evidence when police were already engaged in process of securing a warrant before illegal seizure took place). However, that situation is not present in this case. Law enforcement made no attempt at any time to obtain a warrant for the extraction of the appellant's blood and hair.
[8] The rule provides for an exception when the specific ground is "apparent from the context." Evid.R. 103 (A) (1). In this case, however, trial counsel's objection following Lt. Teaford's opinion does not fall within this exception. Trial counsel stated that he was "renew[ing]" his objection to Lt. Teaford's testimony. The use of the word "renew" makes clear that trial counsel was objecting on competency grounds and not on the ground that Lt. Teaford's methodology was flawed.
[9] Even if the presumption instruction had been erroneous, the prejudicial effect of it would not have been as extensive as the appellant argues. The appellant contends that the instruction warrants reversal of his conviction because it denied him due process of law by relieving the state of its burden to prove all elements of the charged offense beyond a reasonable doubt. See Sandstrom v. Montana (1979), 442 U.S. 510, 520, 99 S.Ct. 2450,61 L.Ed.2d 39; In re Winship (1970), 397 U.S. 358, 364,90 S.Ct. 1068, 25 L.Ed.2d 368.
Aggravated vehicular homicide consists of three elements: (1) reckless, (2) operation of a designated vehicle, and (3) causing the death of another. R.C. 2903.06 (A). A defendant may commit aggravated vehicular homicide without being under the influence of alcohol. Thus, the alcohol specification and the presumption of intoxication authorized by R.C. 2903.06 (B) have nothing to do with any of the elements that the state was required to prove beyond a reasonable doubt. See State v. Schultz (June 7, 1996), Pickaway App. No. 94CA31, unreported; State v. Baker (August 30, 1988), Franklin App. No. 87A9-793, unreported. Rather than relating to the elements of aggravated vehicular homicide, the alcohol specification and presumption (if applicable) relate only to collateral issues involving the permanent revocation of the appellant's license and the imposition of a mandatory prison term. In other words, the erroneous presumption instruction in this case became relevant only after the jury found the appellant guilty of aggravated vehicular homicide. See id. The presumption therefore did not affect the burden of proof as to any essential element of the offense for which the appellant was convicted. Instead, any error related to the presumption instruction would have impacted only the alcohol specification.
[10] Our analysis would differ, of course, if the state had sought to introduce results of a chemical test showing a blood-alcohol level below the presumptive level of intoxication. In that case, the presumption of intoxication provided for in R.C. 2903.06 (B) would not attach and expert testimony would therefore be necessary to "relate the numerical figure to a common understanding of what it is to be under the influence of alcohol." See French, supra, at paragraph two of the syllabus.